Of Counsel:
CLAY CHAPMAN CRUMPTON IWAMURA & PULICE

ROBERT E. CHAPMAN          #2679
rchapman@paclawteam.com
MARY MARTIN                #5475
mmartin@paclawteam.com
700 Bishop Street, Suite 2100
Honolulu, Hawaii 96813
Telephone No.: (808) 535-8400
Facsimile No.: (808) 535-8444

Attorneys for Defendants
 CHEVY CHASE BANK and BANK ONE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LINDA D. DEATON, | CIVIL NO. CV01-00352 SPK/BMK |
| Plaintiff, | |
| vs. | MEMORANDUM IN SUPPORT OF MOTION |
| CHEVY CHASE BANK, a corporation, BANK ONE, a corporation and JANE DOES 1-10 and JOHN DOES 1-10, DOE CORPORATION 1-10, and DOE GOVERNMENTAL ENTITIES 1-10, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION**

**INTRODUCTION**

This matter is before this court as a result of Plaintiff's appeal to the Ninth Circuit, which followed a jury trial conducted by this court in April 2003. Ms. Deaton's original claims included defamation and

disparagement of credit, H.R.S.§480 statutory claims, and the Fair Credit Reporting Act ("FCRA") claim. This court dismissed the defamation and disparagement of credit claim and the 480-2 claim on summary judgment.[1] The FCRA claim was the only claim tried before the jury, which ruled in Defendants' favor based on the statute of limitations. The Ninth Circuit affirmed this court's order granting summary judgment, holding that the facts alleged by Ms. Deaton did not support a claim under Hawaii law for a continuing violation, and therefore her claims under 480 were time-barred.[2] The Ninth Circuit reversed solely on the FCRA claim, finding the jury's verdict that the statute of limitations had not been met was wrong, remanding for a determination on the merits.

**FACTUAL SUMMARY**[3]

The case arose as a result of Ms. Deaton's failure in 1993 and 1994 to exercise her rights under the Fair Credit Billing Act ("F.C.B.A.", codified as 15

---

[1] Actually, Ms. Deaton's counsel attempted to withdraw the defamation and disparagement of credit claim at the argument hearing, but the court denied the request, and granted Defendants' motion for summary judgment on the claim.

[2] The Ninth Circuit Judgment and Memorandum are located in the Court Docket, Entry 259.

[3] The entire factual summary is supported by Defendants' separate concise statement of facts, the majority of which is based on Plaintiff's testimony at trial.

U.S.C. §1666, et seq.) as to an alleged failure of Defendants to correct a multiple billing which appeared on her January 1994 statement. C.S.¶3. Whether or not it was corrected was disputed at trial, however, it is not disputed that Ms. Deaton never filed a lawsuit pursuant to the F.C.B.A.   C.S.¶1-7.

In February 1998, after allowing her friend, Mr. Hariri, exclusive use of the credit card during the intervening period of time (C.S.¶2-3, 7), to the extent of receiving all of the billing statements over the years (C.S.¶8-10), Ms. Deaton learned that her credit report included derogatory reporting including, *inter alia*, delinquency as to that same credit card account, and later learned that later the credit report showed the account as 'charged-off.' C.S.¶11. She did not, at that time, write to the CRA asking them to enter a line contesting the accuracy of the entry. C.S.¶12.

In August 1999, Ms. Deaton purportedly attempted, pursuant to the Fair Credit Reporting Act ("F.C.R.A.", codified at 15 U.S.C. §1681, et seq.), to correct what she believed to be an incorrect credit report as to the Chevy Chase - Bank One entry. C.S.¶13-14. Thereafter, believing that her rights pursuant to the F.C.R.A. were violated, Ms. Deaton brought the instant action on May 25, 2001, against the Banks,

pursuant to the section of the F.C.R.A. which codifies the obligations of the Banks as "furnishers of information", 15 U.S.C. §1681s-2(b). See First Supplemental Complaint filed herein on Dec. 5, 2002 (docket entry 120).

**SUMMARY JUDGMENT STANDARDS**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for the motion, and identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A summary judgment may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages. Fed.R.Civ.P. 56(c).

**ARGUMENT**

  A. **Plaintiff Cannot Establish a Prima Facie Case Under the FCRA, her Claim Should Be Dismissed, and Summary Adjudication Granted to Defendants.**

  It is Plaintiff's burden of proof to show that she has complied with the F.C.R.A., and has a right to a remedy.  See <u>Dalton v. Capital Associated Industries, Inc.</u>, 257 F.3d 409, 416 (4th Cir. 2001).  This is a three pronged process, as it requires first, that she initiate an inquiry through a credit reporting agency ("CRA"), then, in order to find liability as to a furnisher of information (like Defendants), she must show that Defendants did not comply with their obligations under that limited portion of the FCRA which applies to furnishers of information, i.e. 15 U.S.C. §1681s-2(b).  Finally, she must show that Defendants were negligent or willful in noncompliance, AND, that she had actual damages.  15 U.S.C. §1681(n), (o).

  1. **Plaintiff Cannot Show that She Triggered Any FCRA Inquiry in 1999; Her Trigger in 2002 Resulted in Deletion of the Tradelines.**

  First, because the furnisher of information only incurs liability under the FCRA when they are notified of a consumer dispute by a credit reporting agency (not the consumer), Plaintiff must first show that she triggered the F.C.R.A., which can be shown if the following occurs:

1. The debtor notifies a "consumer reporting agency" ("CRA") that she disputed an item of information contained in her file with the consumer reporting agency. 15 USC §1681i(a)(1)(A).

2. That the CRA then provided notification of the dispute to the "furnisher of information" in question, including all relevant information regarding the dispute which was received from the consumer. 15 USC §1681i(a)(2)(A).

3. The CRA reported the results to Ms. Deaton by written notice. 15 USC §1681i(a)(6)(A).

4. The results as reported by the CRA must include:

   a. A statement that the investigation is complete (15 USC §1681i(a)(6)(B)(i)),

   b. A consumer report which reflects the results of the investigation as to the disputed item of information (15 USC §1681i(a)(6)(B)(ii)),

   c. A notice that the consumer may request a description of the procedure used by the CRA to determine the accuracy and completeness of the information, including the business name, address and telephone number of any "furnisher of information" contacted in the investigation (15 USC §1681i(a)(6)(B)(iii)),

   d. A notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information (15 USC §1681i(a)(6)(B)(iv)), and,

   e. A notice that the consumer has the right to request that the CRA furnish notification of the deletion of information, or the dispute of any information, to any person designated by the consumer who has within two years prior thereto received a consumer report for employment purposes, or within six months prior thereto received a consumer report for any other purpose,

    which contained the deleted or disputed information. (15 USC §1681i(a)(6)(B)(v) & §1681i(d))

Fair Credit Reporting Act, 15 U.S.C. §1681i(a)(1)(A), §1681i(a)(2)(A), §1681i(a)(6) and §1681i(d).

  Ms. Deaton allegedly initiated the process described above through the Credit Bureau of the Pacific ("CBP"). C.S.¶14. However, the documentation she provided as proof consisted of CBP's Notice letter <u>to</u> Ms. Deaton, which confirmed the entries of Defendant(s) on her credit report, and the CBP letter to a mortgage lender with a version of her credit report, which <u>DID NOT</u> even include an entry concerning credit with Defendants, much less any derogatory information. C.S.¶15. Indeed, that report showed derogatory information as to Ms. Deaton's credit, on the part of various other creditors, but not these defendants. C.S.¶16.

  The purported "Notice of results of reinvestigation" (the "Notice") which Plaintiff allegedly received from CBP, dated October 11, 1999, did not include any of the information required by statute (identified above), and Plaintiff did not receive any such information from the CBP. (See C.S. ¶14.) Specifically, it does not identify what account(s) were allegedly even re-investigated and it does not include the notices of Plaintiff's rights as stated in

-7-

subsections 1681i(a)(6)(iii), (iv), or (v). It fails to demonstrate that the statutory scheme was implemented. Indeed, had the purported Notice included all of the requirements of federal law, it would have provided Ms. Deaton with a road map of the rights she held to establish any valid claim, including, inter alia, the ability to request a statement of exactly what the CRA did to reinvestigate - including the CRA's procedure and <u>whom it contacted</u> for the information (1681i(a)(6)(B)(iii)). Because the purported Notice did not include the appropriate notice to Ms. Deaton, she has not followed through with any proof that either Defendant ever received notice of the claim, nor did she bother to seek to have a statement of dispute added to the credit report. C.S.¶14, 19.

Even more dispositive of the undisputed fact that Ms. Deaton did NOT trigger the FCRA statute in 1999 is the fact that even if she gave notice to CBP, its means of investigating would have been through one of the national CRA's (TransUnion, Equifax[4], Experian) - and none of those records showed any inquiry to defendants in 1999. Specifically, Ms. Deaton subpoenaed

---

[4]Plaintiff's counsel made an offer of proof at trial that CBP did, in fact, submit FCRA consumer disputes to Equifax, which purportedly conducted a reinvestigation through First USA, nka Bank One. C.S. ¶27.

-8-

the records of TransUnion and Equifax (trial exh. 103, 104), and neither showed any relevant inquiries to the defendants during the period of time when the inquiry was supposed to have been made. C.S. ¶26. Further, Bank One's representative made extensive inquiry through Defendants' records, and found no inquiries prior to 2001. C.S. ¶26.

Insofar as Plaintiff triggered the FCRA in January 2002, Defendants confirmed that the amount of $7,854.00 had been charged off, as that was what the records showed. C.S.¶28. However, due to the lawsuit, in March 2002, they removed all of the allegedly erroneous credit remarks from all three national CRA's. See. C.S. ¶29.

### 2. Plaintiff Cannot Show that Defendants Did Not Comply with the Applicable Section of the FCRA, 1681s-2(b).

Thereafter, in order to prove that the Defendants, the "furnishers of information," violated the applicable section of the Fair Credit Reporting Act (15 U.S.C. §1681s-2(b)(1)), Plaintiff must show that the furnishers of information, on receipt of a notice of dispute from a CRA failed to:

1. conduct an investigation with respect to the disputed information,

2. review all relevant information provided by the CRA,

    3.    report the results of the investigation to the CRA, and

    4.    if the investigation found that the information was incomplete or inaccurate, report the results to all other consumer reporting agencies which compile and maintain files on consumers on a nationwide basis, and to which the furnisher of information did furnish information.

Fair Credit Reporting Act, 15 U.S.C. §1681s-2(b)(1).[5]

These obligations of the furnisher of information are only triggered if the furnisher of information has received the notice from a CRA. In this case, as to Ms. Deaton's alleged trigger in 1999, there was no evidence that the furnisher of information (defendants herein) were ever notified that there was an inquiry. Nonetheless, even if the inquiry by a CRA had been made to the defendants, their investigation should have resulted in a report that the information was correct — Ms. Deaton cannot show that it was not corrected.

Specifically, at trial, Deaton essentially admitted that she cannot prove that any credit card error was not corrected. She only produced the statements from 1993 to March 1994. C.S.¶23. The bank's records could only be captured 7 years back, and once

---

[5] An additional subsection ("e") was added to §1681s-2(b)(1) shortly after the trial held in April 2003; it is irrelevant to this litigation.

they were notified of the litigation, they only had records from closing date of July 1994. C.S.¶21, 23. Based on the date Ms. Deaton complained of the posting error on her billing statement, the correction would have been made in May or June 1994. C.S.¶22.  Therefore, even if she did trigger the statute, there was nothing for defendants to correct or change.  Further, in 2002, when she did trigger an investigation, based on the records in existence (only back to July 1994), the credit report was accurate - the write-off of Ms. Deaton's outstanding debt was accurate; mathematically that was correct based on the records available. C.S.¶24.

More telling is the fact that even if one assumed that the error was not corrected, the manner in which Mr. Hariri utilized the credit card resulted in delinquency, and disparagement of credit. C.S.¶25. The result as to Ms. Deaton's credit report would have been the same.  As shown by Defendants' Trial Exhibit 224, the calculations of charges, payments, and accumulation of interest, starting with a zero balance in August 1994, instead of the balance as shown on the statement, demonstrates that Kamram Hariri consistently allowed a balance to remain on the credit card, and consistently

-11-

allowed interest to accumulate, resulting in a delinquent account. C.S.¶25.

The bottom line, however, is that Ms. Deaton cannot prove that the duplicated billings which occurred in 1993, were not corrected. C.S.¶21-24. Therefore, she cannot prove that either defendant violated the FCRA, as she cannot prove that the information was "incomplete or inaccurate", which is the springboard for a furnisher's obligation to report the results to CRA's. See 15 USC §1681s-2(b).

### 3. Deaton Cannot prove any Actual Damages.

In order to impose any civil liability on a furnisher of information, the Plaintiff must show that the furnisher of information negligently[6] or willfully failed to comply with a requirement of the subchapter. 15 USC §1681(n) and (o). Further, the Plaintiff must prove "actual damages."

Ms. Deaton's only proof of damages was the application for a mortgage loan, but the documents she produced, which had been sent to Mid-Pac Mortgage as the loan application, did not include any information concerning the write-off as to the Chevy Chase/FUSA account. C.S. ¶15. Further, she was qualified for the

---

[6] In closing, Ms. Deaton's counsel admitted that the banks were not negligent. C.S.¶30.

-12-

loan, but chose not to take the loan. C.S.¶17. Interestingly, she qualified for the loan, despite several derogatory listings on that credit report that had nothing to do with Defendants. Those derogatory items included a sizable property lien which she attributed to her former husband - but it remained on her credit report. C.S.¶16. In short, Ms. Deaton provided no evidence that she was ever denied credit, or a loan, on the basis of the write-offs by Chevy Chase/First USA (Bank One). She had no damages.

**B. Ms. Deaton's Own Negligence was the Cause of the Derogatory Information on her Credit Report**

Although Ms. Deaton was the responsible person for the credit card, she allowed Mr. Hariri full and unfettered use of the credit card, and all of the billing statements were sent directly to him. C.S.¶1-3. She claimed to have communicated with him concerning the statements, but apparently ignored the multiple warnings on the statement that the account was in arrears. C.S.¶9-10. For a CPA to allow that to occur on her own credit card is clearly negligent.

Another element of negligence on her part was to ignore the remedy of having a statement added to her credit report, that she contested the write-off of the banks. C.S.¶12, 19. She first was given notice of that right when she received the CreditGuard report in

-13-

February 1998, but never availed herself of that opportunity.

Finally, if, in fact, the billing error from 1993 had truly not been corrected, it was negligent to let the error go, and not exercise her rights under the Fair Credit Billing Act.

Insofar as Ms. Deaton's own negligence was the cause of the derogatory reporting, her tort claim under the Fair Credit Reporting Act should be dismissed.

C.  **Ms. Deaton's Claim Under the FCRA Should Be Dismissed, as She Waived any Claim that the Billing Error Was Not Corrected, When She Failed to Seek a Remedy Pursuant to the FCBA.**

The Ninth Circuit declined to endorse the argument that if a credit card user fails to exercise her remedies under the Fair Credit Billing Act ("FCBA") to correct a credit card error, that she has waived any later argument that there was an error - the result being that she cannot complain of any disparaging information on a credit report that results from the purported error that was waived.  The court stated that there was no precedent.  Defendants respectfully suggest that this court should take the opportunity to set that precedent, as an alternative reason to grant summary judgment, as there is absolutely no question of fact, as

-14-

it relates to this issue - judgment can be entered as a matter of law.

Specifically, Plaintiff's original issues arose in 1993 and 1994 when billing errors allegedly occurred. The specifically alleged billing error was double-billing, which clearly constitutes a "billing error" under the Fair Credit Billing Act ("FCBA"), 15 U.S.C. §1666(b)(1) or (5). See Burnstein v. Saks Fifth Avenue & Co., 208 F.Supp.2d 765, 772, fn 13 (E.D. Mich. 2002).

The FCBA, contained in 15 U.S.C. §1666, et seq., provides obligor with time periods in which to contest a billing as erroneous (60 days), and controls the obligations of the creditor, as well. The creditor must take steps within ninety (90) days after receipt of the notice alleging an error. If the creditor is in "noncompliance" with the instant statute, the creditor forfeits certain collection rights (15 U.S.C. §1666(e)).

Thereafter, the creditor is subject to civil liability pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. §1640(a), for failure to comply with the FCBA. TILA (15 U.S.C. §1640(a)) imposes liability and provides the consumer remedy for violation of Part D of the Consumer Credit Protection Act (aka Fair Credit Billing Act) - "Credit Billing" - 15 U.S.C. §1666 et seq. However, any TILA action under 15 U.S.C. §1640 must be

brought "within one year from the date of the occurrence of the violation." 15 U.S.C. §1640(e).

In the instant case, therefore, pursuant to 15 U.S.C. §1666, et seq., Defendant(s) had until approximately May of 1994 to adequately deal with Plaintiff's allegations of errors in late 1993. Thereafter, pursuant to 15 U.S.C. §1640(e) Plaintiff had until approximately May of 1995 to bring a civil action for Defendant(s) alleged failure to correct the billing. See Burnstein, 208 F.Supp.2d at 775-776, brought under similar claims, in which two of plaintiff's claims were time-barred:

> As noted, the FCBA requires that a creditor provide written acknowledgment with 30 days after receiving notice of a claimed billing error, see 15 U.S.C. §1666(a)(A), and that the creditor resolve the billing dispute, whether favorably or unfavorably to the consumer, within 90 days after receiving notice of it, see 15 U.S.C. §1666(a)(B). Plaintiff gave notice of her claimed billing errors on January 15, 2000. It follows that Defendant was obligated to acknowledge these claims on or before February 15, 2000, and to resolve them by April 15, 2000. **Plaintiff's right of action as to these violations arose on these two dates, and she was required to bring suit as to these violations within a year of these dates.** She did not do so, but instead commenced this action on June 1, 2001. Consequently, Plaintiff's claims arising from Defendant's violation of the 30-day and 90-day requirements of §1666(a) are time-barred. (Emphasis added).

-16-

208 F.Supp.2d at 776.

Applying that analysis in the instant case, Ms. Deaton allegedly informed Defendant Chevy Chase in January 1994 of the purported billing error. Using the outside of the analysis dates, she had 90 days plus one year to bring suit concerning the billing errors - her deadline was in or about April 1995. Ms. Deaton did not ever bring an FCBA claim. Under the Burnstein analysis, any claim of billing error at this time is time-barred. Further, the Burnstein case disposes of any argument under a "continuing violation" doctrine. Id. *See also* Miguel v. Country Funding Corp., 309 F.3d 1161 (9th Cir. 2002) (applying strict construction to the limitations deadlines under TILA).

Further, the records retention requirements of Regulation Z (the implementing regulation for TILA) as to evidence of compliance is two (2) years. 12 C.F.R. §226.25. Therefore, Defendants had no obligation to retain any records concerning Plaintiff's alleged erroneous billing claims after March or April 1996 (two years after Plaintiff's last effort with Mr. Hariri to correct the allegedly erroneous billing). From April 1996, the records concerning the charges must be deemed accurate. Based on that uncontroverted set of facts,

even assuming that the error was not corrected, for having failed to even attempt to utilize her remedies under the FCBA, Ms. Deaton is precluded from arguing, seven (7) years later, that Defendants have violated the FCRA, for not correcting an error that Ms. Deaton allegedly knew of, and failed to correct.

**CONCLUSION**

Ms. Deaton's claim under the FCRA cannot be proven. She cannot prove that she triggered any investigation (in 1999), she cannot prove that either Defendant, as a furnisher of information, was in noncompliance with the statute, she cannot prove that the billing error from 1993 was not corrected, she cannot prove that she ever suffered actual damages from the derogatory entry of defendants on her credit report, she cannot prove that she was not negligent – because she was negligent. Finally, she waived any claim that the credit card billing had not been corrected when she failed to pursue remedies pursuant to the FCBA.

Ms. Deaton's failure on ANY of these points requires dismissal of this case.

DATED: Honolulu, Hawaii, _March 17_, 2006.

_____
ROBERT E. CHAPMAN
MARY MARTIN
Attorneys for Defendants