1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                        DISTRICT OF HAWAII

3   LINDA DEATON,                    )    CIVIL NO. 01-00352SPK-BMK
                                     )
4              Plaintiff,            )    Honolulu, Hawaii
                                     )    April 16, 2003
5        vs.                         )    10:15 a.m.
                                     )
6   CHEVY CHASE BANK, et al.,        )    FURTHER JURY TRIAL
                                     )    VOLUME 3
7              Defendants.           )
    _____    )

8
                        TRANSCRIPT OF JURY TRIAL
9            BEFORE THE HONORABLE SAMUEL P. KING,
                SENIOR UNITED STATES DISTRICT JUDGE
10
    APPEARANCES:
11
    For the Plaintiff:           ARNOLD T. PHILLIPS, II, Esq.
12                               Attorney at Law
                                 Century Square
13                               1188 Bishop Street, Ste. 3003
                                 Honolulu, Hawaii 96813
14

15

16  For the Defendant:           MARY MARTIN, Esq.
                                 Stanton Clay Chapman Crumpton
17                                 Iwamura
                                 Topa Financial Center
18                               700 Bishop St., Ste. 2100
                                 Honolulu, Hawaii 96813
19

20  Official Court Reporter:     Cynthia Tando Fazio, RMR, CRR
                                 United States District Court
21                               P.O. Box 50131
                                 Honolulu, Hawaii 96850
22

23

24

    Proceedings recorded by machine shorthand, transcript produced
25  with computer-aided transcription (CAT).

1    need to.

2            But if you would turn in your book, the plaintiff's

3    exhibit book, back to Exhibit Number 7.  This is your January

4    21, 1994 letter to Chevy Chase Bank, correct?

5    A    Correct.

6    Q    And this was sent in response to a billing statement that

7    had a closing date of January the 12th of 1994; is that

8    correct?  That's your Exhibit 7B.

9    A    Let me look at that, Ms. Martin.

10   Q    Oh, I take it back.  That's not 7B -- oh, wait, yes, it

11   is.  7B has the statement closing date of January 12th of

12   1994.

13   A    Statement closing date, yes.

14   Q    Yes.  And that statement was sent from Chevy Chase's P.O.

15   Box 17423, correct?

16   A    Yes.

17   Q    And it was sent to -- it's addressed to you and to

18   Mr. Hariri, correct?

19   A    Correct.

20   Q    At P.O. Box 88252, correct?

21   A    Correct.

22   Q    Correct me if I'm wrong, but I believe you testified that

23   that's his P.O. Box; is that right?

24   A    Correct.

25   Q    So at this time, we've heard already that the card, even

DEATON - CROSS                                    3-120

1   though it was your card, you were responsible, he was using

2   it; can we presume that by this time the statements were going

3   to his address; is that correct?

4   A    It says his address there.

5   Q    Okay.  And the Exhibit Number 7 has a return address of

6   his address, correct?

7   A    Number 7.  It's the same address as on the statement.

8   Q    Okay.  And the -- it was mailed to Chevy Chase at that

9   P.O. Box 17423, correct?

10  A    Correct.

11  Q    Which was the address from where the billing statement

12  came, right?

13  A    Correct.

14  Q    Okay.  So you knew at least as of January 21 of 1994 that

15  you were contesting something on your statement; is that

16  right?

17  A    That's right.

18  Q    Let us flip over to, please, Exhibit 15.  15 is your

19  March 28, 1994 letter to Chevy Chase, correct?

20  A    That's correct.

21  Q    This is the one that you explained to us how you sent it

22  to a street address, Spectrum Drive, correct?

23  A    Yes.

24  Q    If you look at Page 15 -- or exhibit Page 15C?

25          THE COURT:  Wait a minute.  Am I with you?  Is this

DEATON - CROSS                               3-121

1    15?

2              MS. MARTIN:  Yes, we're at 15.

3              THE COURT:  I thought -- I thought it was addressed

4    to P.O. Box 909?

5              MS. MARTIN:  It is addressed to P.O. Box 909, Your

6    Honor, but I believe we can confirm from her testimony and I

7    just wanted to verify --

8              THE COURT:  Ask her --

9              MS. MARTIN:  -- where the letters went to.

10             THE WITNESS:  Sir.

11             THE COURT:  It didn't go to P.O. Box 909?

12             THE WITNESS:  We did the certification to the street

13   address because at that time I was under the understanding you

14   couldn't go to a P.O. Box.

15   BY MS. MARTIN:

16   Q    And that's -- that's what shows on Exhibit 15C, correct?

17   A    Correct.

18             THE COURT:  Oh, I see.  Okay.

19   BY MS. MARTIN:

20   Q    And the date that you actually sent this letter was April

21   2nd, right?

22   A    Yes.

23   Q    That's what the date stamp shows on Exhibit 15C.

24             THE COURT:  You can't get a certified mail sent to a

25   box -- P.O. Box.

1          THE WITNESS:  I think it went -- it went along

2     with -- a copy of the letter went along with the March 28th

3     letter, and we had a little bit of difference on that because

4     we typed in the bottom, I believe -- let me look, Ms. Martin.

5          THE COURT:  Well, it did or it didn't, and you're

6     talking about seven days.

7          MS. MARTIN:  Correct, Your Honor, but seven days can

8     be seven very important days.

9          THE WITNESS:  It did go out.

10    BY MS. MARTIN:

11    Q    It went out, but you don't know when.  In fact -- well,

12    let's look at Page 14A.  That's one of your attachments to the

13    March 15th letter.

14    A    Right.

15    Q    Page 14A is that notarized statement of yours?

16    A    The 18th.  I said it may not have gone right out at the

17    15th.

18    Q    So based on this letter, it couldn't have gone until at

19    least the 18th, right?

20    A    Correct.

21    Q    If then.  Thank you.

22          Now, you testified on direct examination that you

23    were using the subject credit card in 1993 and that Kamran was

24    also using it, correct?

25    A    I don't recall exactly how that was stated.

DEATON - CROSS                                3-125

1   Q      Which -- who was actually using the credit card in 1993?

2   A      Kamran.  Kamran used it most --

3          THE COURT:  That always confuses me because you only

4   had one card?

5          THE WITNESS:  I had another card I used for a lot of

6   personal things.

7          THE COURT:  But I mean on this same account.

8          THE WITNESS:  This -- only one card for this same

9   account, that's -- I at one time probably had a card, but I

10  don't know when I put it away.

11         THE COURT:  You never used it?

12         THE WITNESS:  Very seldom.

13         THE COURT:  But there was another card on the same

14  account?

15         THE WITNESS:  Yes.

16         THE COURT:  One to you and one to --

17         THE WITNESS:  Yes.

18         THE COURT:  -- Hariri?

19         THE WITNESS:  Yes.

20  BY MS. MARTIN:

21  Q    Well, you were the responsible party on the account;

22  isn't that correct?

23  A    That's right, and I reviewed the statements.

24  Q    Did you hear your counsel identify Mr. Hariri as a friend

25  and associate during the opening statement yesterday?

DEATON - CROSS                                3-129

1    BY MS. MARTIN:

2    Q    Isn't it true, though, that, Ms. Deaton, in October of

3    1993, you were questioned as to Mr. Hariri's assets?

4    A    I don't recall that, no, ma'am.

5    Q    We can bring in the attorney to -- who questioned you.

6          MR. PHILLIPS:  Well, Your Honor, I'm going to

7    object to --

8          THE COURT:  That was an improper statement.  You want

9    to do that, go ahead and bring him in if he's -- if the

10   evidence is admissible.  I'll sustain the objection.

11   BY MS. MARTIN:

12   Q    The charges that were incurred in November 1993 at the

13   Maui Inter-Continental and through Budget and Amerivox were

14   all incurred by Mr. Hariri, correct?

15   A    Correct.

16   Q    And he was traveling with somebody else and signed in

17   under a Mr. and Mrs. Hariri; isn't that right?

18         THE COURT:  If you know.

19         THE WITNESS:  I really don't.

20         THE COURT:  You weren't there?

21         THE WITNESS:  I was not there.

22   BY MS. MARTIN:

23   Q    Well, Ms. Deaton, you have asked and had the court admit

24   into evidence Exhibit Number -- it's either -- don't have my

25   numbers well enough marked, but it's either --

1            THE COURT:  I can't see how that's relevant.

2            MS. MARTIN:  Her knowledge, Your Honor.  Her

3    knowledge and --

4            THE COURT:  So what?

5            MS. MARTIN:  -- her contribution to this whole thing.

6            THE COURT:  You want to prove he was there with

7    somebody else?

8            MS. MARTIN:  People have an obligation to watch their

9    credit cards, Your Honor.

10           THE COURT:  You object?

11           MR. PHILLIPS:  I object, Your Honor.

12           THE COURT:  Sustain the objection.

13           MR. PHILLIPS:  Thank you.

14   BY MS. MARTIN:

15   Q    Now, Ms. Deaton, you testified earlier, either today or

16   yesterday, that Mr. Hariri was sending you the credit card

17   statements or you were getting them from him on a quarterly or

18   semiannual basis; isn't that correct?

19   A    I did look at them, yes.

20   Q    You testified that it was quarterly or semiannually,

21   correct?

22   A    My exact words, I don't know, but I'm sure -- you know,

23   two or three times a year I think is what I said.

24   Q    Isn't it actually true that you did not get the

25   statements from him?

1    A    No, ma'am.

2    Q    Ms. Deaton, do you remember being called to my office for

3    a deposition in November -- last November, November 5th of

4    2002?

5    A    Yes, ma'am.

6    Q    And we asked you questions in front of a court reporter?

7    A    Yes, ma'am.

8    Q    And you were sworn to tell the truth?

9    A    Yes.

10    Q    And at the end of the deposition you were told you would

11    be given a copy of the deposition to review?

12    A    Yes.

13    Q    And you were given a copy of the deposition to review?

14    A    Yes, ma'am.

15    Q    And you made no corrections; isn't that correct?

16    A    That's correct.

17              MS. MARTIN:  I would ask the court to unseal the

18    deposition of Ms. Deaton.

19              THE CLERK:  (Complying).  Do you have a page number,

20    Ms. Martin?

21              MS. MARTIN:  I'm going to be looking at Page Number

22    162 through 164.

23              THE CLERK:  (Handing document.)

24              MS. MARTIN:  Focusing on 163 and 164 at this point.

25              THE WITNESS:  163.

DEATON - CROSS                                3-132

1    BY MS. MARTIN:

2    Q    I'm going to read to you starting from Line 24 on Page

3    163 down through Line 15 on 164, and I would ask that you

4    follow along with me and check my reading for accuracy.

5         Starting with that Line 24, this was me talking:  "My

6    question is:  Were you still using the account when you wrote

7    this letter?"  On Page 164.

8         Your answer:  "I was not using the account.  Kamran

9    may have been using it but almost -- I'd say just quick

10   calculation in '98, most of that money that was owed would

11   have been due to the interest on the 2000.  Interest in

12   overlimit because of the 2000 being on there erroneously.

13        "Question:  Who was receiving -- can I presume that

14   statements were being sent monthly?

15        "Answer:  I would think they probably were.

16        "Question:  To you or to Kamran?

17        "Answer:  To Kamran.

18        "Question:  Was he letting you know on a monthly

19   basis that the statements were coming?

20        "Answer:  No.

21        "Question:  He didn't forward them to you?

22        "Answer:  No."

23        Did I read that correctly, Ms. Deaton?

24   A    You read what was said.

25   Q    Thank you.

1    A    What is the question?

2    Q    I just asked if -- the question was:  Did I read that

3    correctly?  That was out of the deposition from November 5th

4    of 2002.

5    A    I didn't receive them monthly.

6    Q    Ms. Deaton, did I read the testimony accurately out of

7    the deposition?  That's just a "yes" or a "no," please.  Did I

8    read the testimony accurately?

9    A    Yes, you did.

10   Q    Thank you.

11        The Rancho Mirage address that shows on some of these

12   statements was Kamran's address, correct?

13   A    Correct.

14   Q    And you never lived there; is that right?

15   A    Correct.

16   Q    Isn't it true -- your testimony today was that you asked

17   on one of your telephone calls to the bank, you told them in

18   1998, I believe, that you were thinking about getting rid of

19   the card?

20   A    Yes.

21   Q    Isn't it actually true --

22   A    1997.

23   Q    Excuse me?

24   A    I think it was 1997.

25   Q    1997, 1998.  Isn't it actually true that in 1994 you

DEATON - CROSS                           3-135

1    Q    I'm not asking about the deposition.  I'm asking you a

2    question.  Isn't it true that you asked him to return the card

3    to you?

4              THE COURT:  Do you have something from the deposition

5    you want to read to her, go ahead.

6    BY MS. MARTIN:

7    Q    If you don't have a recollection, we will ask for your

8    deposition testimony.

9    A    All right.

10   Q    If you turn to Page 30 in the deposition.

11   A    Okay.

12   Q    I'm going to start reading at Line Number 15, and I will

13   go to the --

14             THE COURT:  What page?

15             MS. MARTIN:  I'm sorry, Your Honor.  On Page 30, Line

16   15, Your Honor.

17   BY MS. MARTIN:

18   Q    Question --

19             MR. PHILLIPS:  Where are you going to read to,

20   Ms. Martin?

21             MS. MARTIN:  Top of Page 31, Line 1.

22   BY MS. MARTIN:

23   Q    Page 30:  "Did you ever ask him to return the credit card

24   to you?

25             "Answer:  At one time, yeah.

1        "Question:  When?

2        "Answer:  After this fiasco started, I said:  Let's

3   get rid of it.

4        "Question:  And what was his response?

5        "Answer:  We were trying to work through it.  So I

6   can't recall either a yea, nay or -- I thought the credit card

7   company handled it.

8        "Question:  Well, I'm talking about the specific

9   card.  Did he send it back to you?

10       "Answer:  No."

11       So you didn't close the account in 1994, did you?

12  A    That's correct.

13  Q    Your testimony today was that you made calls to Chevy

14  Chase off and on without any specificity during the time

15  period between 1964 and 1960 -- I mean 1994 and 1998; isn't

16  that correct?

17  A    Correct.

18  Q    But isn't it actually true that from early 1994 to

19  February of 1998, you did not make any efforts to contact

20  Chevy Chase?

21       THE COURT:  From '94 to '98?

22       MS. MARTIN:  Yes, Your Honor.

23       THE COURT:  Not in '95, '96 or '97?

24       THE WITNESS:  I made calls, yes, ma'am.

25       THE COURT:  You did?

DEATON - CROSS                           3-137

1         THE WITNESS:  Yes, ma'am -- yes, sir.

2    BY MS. MARTIN:

3    Q    Your testimony today is that you made calls?

4    A    Yes, ma'am.

5    Q    I ask you to turn in the deposition to Page 162.  I'm

6    going to start reading at Line 11.  Tell me when you're there.

7    A    Okay.  I'm trying to flip through, so excuse me for being

8    slow here.

9    Q    No, no.

10        MR. PHILLIPS:  How far are you going to read, please?

11        MS. MARTIN:  Just a moment, because I am going to

12   have to skip.

13        THE WITNESS:  Okay.  I'm at 162.

14   BY MS. MARTIN:

15   Q    Going to read from Line 11 down to the end of that page

16   on to Page 163 through Line 2, and then I will start up again

17   at Line 7 on Page 163 and go through Line 14 -- no, through

18   Line 19.

19        Starting on Page 162, Ms. Deaton, at Line 11:

20        "Question:  Okay.  Going to the letter that's Bates

21   stamped number 042, it is a letter on the Linda Deaton/Kamran

22   Hariri letterhead dated February 28th, 1998, addressed to

23   Chevy Chase Bank.  Do you recognize this letter?

24        "Answer:  Uh-huh.

25        "Question:  Did you draft it or did Kamran draft it?

DEATON - CROSS                              3-138

1          "Answer:  We both had a hand in it.

2          "Question:  What instigated writing it?

3          "Answer:  The situation had not been solved yet.  We

4   were trying to get it, you know, the mistake which we've been

5   working on, corrected.

6          "Question:  But you don't remember any particular

7   event that caused you to start communicating with Chevy Chase

8   again?

9          "The letters and files that you've given to us have a

10  gap in time from about '94 'til '98, when there was no

11  communications.

12         "Answer:  Well, I assume that --"

13         Then skipping to Line 7, your question:  "Could you

14  repeat the question?"

15         I repeated the question.

16         "The question essentially is:  What made you start

17  initiating correspondence with Chevy Chase again concerning

18  this in 1998?

19         "Answer:  So much has happened.  We've been trying to

20  work on this.  Now I had gotten the credit report and I had

21  mentioned earlier or we had talked from Privacy Guard dated

22  February 6.

23         "Question:  But the Privacy Guard thing -- okay.  So

24  if you --

25         "Answer:  And I had voiced a comment that I was

1    concerned about the balance.

2              "Question:  Okay.  So that's what --

3              "Answer:  That may have been."

4    A    That was a letter and that was what I was referring to is

5    written communication.

6    Q    The question had referred to letters and files that had a

7    gap in time from '94 until '98.

8    A    That was a letter.

9    Q    Well, Ms. Deaton, let us --

10             Ms. Deaton, do you remember providing a request to

11   answers for interrogatories?  They're attached as Exhibit H to

12   your deposition.

13             MS. MARTIN:  I'm not sure if she was given the

14   exhibits to the deposition.

15             THE CLERK:  Yes, the exhibits are right over there.

16   Do you want the exhibits also?

17             MS. MARTIN:  Yes, please.

18   BY MS. MARTIN:

19   Q    Would you turn to Exhibit H in the deposition -- in the

20   exhibits to your deposition.

21   A    Exhibit which number?

22   Q    Exhibit H.  There should be tabs on the exhibits.  Each

23   exhibit was pretty fat if you remember.  There's no tabs on

24   your exhibits?

25   A    No, ma'am.

1   Q    That's the original.  Do the green dividers help?

2        MS. MARTIN:  Should be at least two-thirds to

3   three-quarters of the way through.

4        THE CLERK:  It's H, right?

5        MS. MARTIN:  Yes.

6        THE CLERK:  Okay.  I'm almost there.  She has it.

7        MS. MARTIN:  Thank you.

8        THE CLERK:  You're welcome.

9   BY MS. MARTIN:

10  Q    Ms. Deaton, I know it's been a while since you've looked

11  at this, so would you take a quick look through Exhibit H,

12  especially noting the last page of it just so you refresh your

13  recollection.

14  A    (Perusing document).

15  Q    This is your response to the Defendant's Request for

16  Answers to Interrogatories in this lawsuit; is this correct?

17  A    For answers -- it says:  "Defendant Chevy Chase Bank's

18  First Request for Answers to Interrogatories."

19  Q    Yes.  Do you remember doing the answers to this?

20  A    I'm -- let me find the questions first.

21  Q    Mine has a mark at the bottom of the page from the court

22  reporters that Page 8 is the first question page of the

23  interrogatories.  Yours don't have any numbers on the bottom?

24  A    I see a Page 7.  Eight is not numbered.  I've got Page 8,

25  interrogatories.

DEATON - CROSS                                          3-141

1   Q     Okay.  Page 8.  Those are the numbers I'm referring to.

2         Okay.  Page 8, the first interrogatory that was asked

3   of you -- and I'll read this to you, and please tell me if I

4   am reading it accurately -- says:  "Provide a detailed

5   explanation and chronology of each attempt you made from

6   December 1993 to the present of your attempts to correct your

7   credit card account with Defendant Chevy Chase Bank and/or its

8   successor, including details for each attempt on when the

9   attempts were made, including the date, the form of

10  communication, telephone, letter, et cetera, and the person

11  contacted."

12        Did I read that correctly?

13  A     Yes, ma'am.

14  Q     And the answer says:  "See attached chronology."  The

15  chronology, I believe, is Page 17, but you can clarify if you

16  agree that that is the attached chronology to which you refer.

17  These are your answers, correct?

18  A     Attached chronology to interrogatory 1.  Yes, it doesn't

19  have a page number.

20  Q     Okay.  But it is in chronologic order, correct?  I see

21  dates on there and I'm only asking for verification.  There's

22  a dates in there that are in 1993 and '94 on the first page of

23  that chronology.  Go to the next page of the chronology, there

24  is dates that go down through 1994 and then they skip to

25  February of 1998.

1    A    That was basically a listing of all the letters and

2    statements.

3    Q    But the interrogatory did ask for all communications and

4    attempts including telephone calls, letters, et cetera,

5    correct?

6    A    That's correct.

7    Q    Thank you.

8         Ms. Deaton, I'm going to ask you to turn in the

9    Defendant's Exhibits manual --

10   A    Is it this red one here?

11   Q    I believe it's a red one.

12        THE CLERK:  It says "defendants."  The next one.

13   There you go.

14   BY MS. MARTIN:

15   Q    You have the manual there?

16   A    Yes, ma'am.

17   Q    Thank you.  Would you turn to a very fat document that's

18   marked Number 209.  Look for tab 209.

19                        (Counsel conferring.)

20   BY MS. MARTIN:

21   Q    Now, Ms. Deaton, I know that you have seen this at this

22   point, but I don't believe that you received the originals of

23   this, but I would ask you to glance through this and, if you

24   can -- and I'll help you if you need help -- I'll ask you to

25   identify as best as you can what this exhibit represents.

DEATON - CROSS                          3-149

1          MS. MARTIN:  I apologize.

2          MR. PHILLIPS:  You identify these documents by the

3    payment due date or statement closing date?

4          THE COURT:  Don't -- don't --

5          MS. MARTIN:  I would like to use the statement

6    closing date.

7          THE COURT:  Don't start talking to each other.

8          MS. MARTIN:  He was asking a question for

9    clarification.

10   BY MS. MARTIN:

11   Q     The statement closing date -- there's two dates that are

12   key on these statements, aren't there, Ms. Deaton; the

13   statement closing date and the statement due date?

14   A     Correct.

15   Q     Okay.  And the form changed over the years, too, correct?

16   A     Many times.

17   Q     Okay.  At this time, the statement closing date is shown

18   right in this little area.  And will you agree with me that

19   the statement closing date says 7/12 of '94, right?

20         THE COURT:  Is which again?

21         THE WITNESS:  7/12/94?

22         MS. MARTIN:  July 12th, 1994.

23         THE COURT:  Not in order.

24   BY MS. MARTIN:

25   Q     For this particular billing statement, the account was

1    being used, right, Ms. Deaton?

2    A    Yes, ma'am.

3    Q    Okay.  And it was being sent to Mr. Hariri's P.O. Box,

4    correct?

5    A    Correct.

6    Q    Okay.  Then I know this is going to be -- this may not be

7    the easiest --

8            THE COURT:  July 12th, 1994.

9            MS. MARTIN:  Was that -- I'm sorry, Your Honor, I

10   didn't hear your question.

11           THE COURT:  The number down at the bottom is -- go

12   ahead.

13           MS. MARTIN:  Okay.

14   BY MS. MARTIN:

15   Q    So that -- were the statements all going to Mr. Hariri at

16   that point in time?

17   A    Yes.

18   Q    So where we've got a statement that's -- was his address

19   in Scottsdale, Arizona, at one point in time?

20   A    Uh, I --

21   Q    I'm not asking you to look at -- just off the top of your

22   head.

23   A    I'm not sure.  It was on the Mainland.  I remember, I

24   think, Santa Mirage.

25   Q    If you will turn over two pages backwards -- oh, I'm

DEATON - CROSS                                3-151

1    sorry.  Yes.  This is the statement with a closing date of

2    August 11, 1994, correct?

3    A    Correct.

4    Q    And down here on the information line, it says:  "Please

5    pay past due amount immediately to avoid suspension of your

6    account."  Isn't that what it says?

7    A    Yes.

8    Q    Thank you.

9              THE COURT:  Does it show the past due --

10   BY MS. MARTIN:

11   Q    And if you will turn over --

12             THE COURT:  Does this one show the past due amount on

13   it?

14             MS. MARTIN:  Which one are you looking at, Your

15   Honor?

16             THE COURT:  The one you were just talking about.

17             MS. MARTIN:  Yes.

18             THE COURT:  Well, where is it?

19             MS. MARTIN:  This is the statement closing date of

20   August 11, 1994.

21             THE COURT:  Where does it show the past due amount?

22             MR. PHILLIPS:  Well, you can't see it, Judge, because

23   this is an incomplete document.  That would be -- it's all cut

24   off.

25             THE COURT:  Oh, I see.  Down there in the black

1    somewhere?

2             MR. PHILLIPS:  No, it is on the --

3             MS. MARTIN:  Actually, no, it is not an incomplete

4    document.  If you go over to -- it is -- there's two pages to

5    this particular statement.  It says Page 1 of 2 and Page 2 of

6    2.

7             MR. PHILLIPS:  She's right.  I'm sorry.

8             THE COURT:  What's the past due amount?

9             MS. MARTIN:  And on Page 2 of 2, it shows a finance

10   charge and the information up at the top of the page is not

11   legible on any of the copies.

12            THE COURT:  Previous balance probably.  Anyway, go

13   ahead.

14            MS. MARTIN:  It's in there.

15   BY MS. MARTIN:

16   Q    Then flipping -- I would ask everybody to turn in

17   their -- the statements -- see if I got the right one -- this

18   one dated December 12th of 1994.  Statement closing date of

19   December 12, 1994.

20            And this one says, again at the bottom:  "Please pay

21   past due amount immediately to avoid suspension of your

22   account."  Isn't that correct?

23   A    That's what it says, yes, ma'am.

24   Q    If you turn two pages --

25            THE COURT:  I see one for September 13th.  You got

DEATON - CROSS                                    3-153

 1    one through September 12th, too.

 2              MS. MARTIN:  We're in December --

 3              THE COURT:  12/12.  Okay.

 4              MS. MARTIN:  Yes, 12/12/94.

 5              THE COURT:  Got it.

 6    BY MS. MARTIN:

 7    Q    And I'm turning to -- going into the next year.  I can

 8    barely read it up there myself.

 9              MS. MARTIN:  Is this the 1995 -- boy.

10              (Counsel conferring.)

11    BY MS. MARTIN:

12    Q    Okay.  Looking at the statement closing date of 1/12/95,

13    again:  "Please pay past due amount immediately to avoid

14    suspension of your account."

15              Then I'm going to ask you to turn to the statement

16    has a closing date of April 12th, 1995.  1995, we have a

17    balance running here of $5,600 in 1995, correct?

18    A    I believe that's because of a cash advance.

19    Q    And -- Mr. Hariri's cash advance?

20    A    Right.

21    Q    And this statement is sent to a Scottsdale, Arizona

22    address.  Whose address is that?

23    A    It's Kamran's.

24    Q    Oh, so he was living in -- you know for sure if he was

25    living in Scottsdale, Arizona?

1   A    This bill was mailed to Scottsdale.

2   Q    But it doesn't even have his name on it.

3   A    Right.

4   Q    But it wasn't mailed to you, correct?

5   A    Correct.

6   Q    And he was responsible -- you had given him the -- the

7   charge card to use, right?

8   A    We were using it for business expenses.

9   Q    You were in business with him at the time?

10  A    We were both using it for business expenses.  We was

11  hoping to make some investments.

12  Q    I thought you said you weren't using the card earlier?

13  A    He used it mostly for his business expenses.  I had

14  the -- a card available to use it.

15  Q    Oh, okay.  Going over to the statement dated August 11th

16  of 1995.  This one is a little easier to read, thank goodness.

17       This one is also addressed to the Scottsdale address

18  and, Ms. Deaton, doesn't this one again say:  "Please pay past

19  due account immediately to avoid suspension of your account"?

20  A    I don't see a late charge, so that --

21  Q    But the language is on there saying:  "Please pay past

22  due account immediately to avoid suspension," correct?

23  A    It does say that, yes, ma'am.

24  Q    Thank you.

25       And I would ask you to turn over to the statement

DEATON - CROSS                              3-155

1    dated December of 1995.  This one dated December of 1995 again

2    has your name and the Scottsdale address, but it again was

3    going to Kamran Hariri, correct?

4    A    Yes, ma'am.

5    Q    This one -- do you have the page yet, Ms. Deaton?

6    A    What was the date again?

7    Q    The statement closing date of December 12, 1995.

8    A    Payment due by -- statement closing date, you said?

9    Q    Yes.

10   A    Can't read the titles up at the top.  I'm sorry.

11   Q    It's buried in that little line.

12   A    That's a statement --

13   Q    If you are looking --

14   A    I can't read it.

15   Q    If you are looking at the payment due date, it is January

16   6th of '96, if you are looking at that top line for a date.

17   A    Okay.  Payment due date, 12/5 -- you want a payment due

18   date by 12/5?

19   Q    No, I'm looking payment due date of January 6, '96.

20   A    Okay, I found it.

21   Q    You got it.  Okay.  And this is the statement closing

22   date of December 12, '95, correct?

23   A    Repeat that again?

24   Q    This is the statement closing date of December 12, 1995,

25   correct?

1    A    I see that on here, yes, ma'am.

2    Q    Okay.  This one has a reminder, a bigger -- a different

3    reminder than you've had before.  I believe it says in the

4    middle of the page:  "Reminder.  You have exceeded your credit

5    limit.  Please submit an additional payment to cover this

6    amount."  Is that correct?

7    A    Correct.

8    Q    If you will turn to the very next page, going forward, of

9    course, this is the statement closing date of January '96.

10   Now, this one has a new address on it, and I would like a

11   clarification of whose address.  This one says Linda Deaton

12   and Kamran Hariri at P.O. Box 75043.

13   A    Kamran.

14   Q    That's -- in Honolulu.  So Kamran moved back to Hawaii

15   then?

16   A    He was in -- in Hawaii most of the time.  He had another

17   address on the state because -- on the Mainland because he did

18   go over there quite often, but he didn't just totally over

19   there.

20   Q    Oh, okay.  This one says your account is past due.

21   A    Then, again, I still don't see a past due amount.

22   Usually if it gets too past due, they'll hit you with a past

23   due charge.

24   Q    Well --

25   A    Sometimes when your payment is on the way there, they say

DEATON - CROSS                              3-157

1    this is due, but as long as your payment gets there, you are

2    not hit with the late charge, and I think that's what these

3    are.

4    Q    Well, the document says your payment is past due, doesn't

5    it?

6    A    They do -- yes, it does.  Yes, ma'am.

7    Q    Thank you.

8         Then I'm going to ask you to turn several pages to a

9    statement with a closing date of April 10, 1997.

10   A    Statement closing date you said?

11   Q    Yes.

12   A    April 10 of 1997.

13   Q    Yes.  We're in a different form at this point.  The

14   statement closing date shows on the document over there

15   under -- on the left side of the document, it shows under

16   account summary for the closing date.  I'm only using these

17   for references.

18        Could you identify the address to where this billing

19   statement was sent, Ms. Deaton?

20        THE COURT:  If you found it already.

21        THE WITNESS:  Up at the top, it says 350 Ward.

22   BY MS. MARTIN:

23   Q    And that's with a P.O. Box?  Is that a P.O. Box 106251?

24   A    Doesn't say P.O. Box.

25   Q    No, it doesn't.  What address is that?

1    A    Undoubtedly Kamran.  It's not my address.

2    Q    But you don't know for sure if that's Kamran's?

3    A    I'm not sure, no, ma'am, but I would imagine it is.

4    Q    Flipping a few more pages to the statement with a

5    statement closing date of September 11th of '97.

6    A    I can't read -- it's hard to read.  It may -- it's 11/97

7    is all I can tell.

8    Q    Okay.  Well, if you look up at the top right-hand side on

9    the new balance, are you looking at the page that has

10   $5,788.52 as the new balance?

11   A    Yes, ma'am.

12   Q    Okay.  Then you're at the right place.  On this

13   particular statement over on the left-hand side under the new

14   balance, there's an account summary and some numbers, and then

15   there's some writing.  And that says:  "Are you aware that

16   your Chevy Chase card account has fallen past due?  Please pay

17   today."  Is that correct?

18   A    That's right.

19   Q    Then if we go over to the statement that is dated

20   November 12th of 1997.  This one again is sent to that Ward

21   Avenue address; isn't that correct, Ms. Deaton?

22   A    Correct.

23   Q    And again, in November, we just heard in -- there was a

24   notice in September of being due, and in November again, it

25   says:  "Are you aware that your Chevy Chase credit card

1    account has fallen past due?  Please pay today."  It's on

2    there, right?

3    A    Yes.

4    Q    And the very next page, which is the statement closing

5    date of December '97, again says:  "Are you aware that your

6    Chevy Chase credit card account has fallen past due?  Please

7    pay today."  Doesn't it say that?

8    A    Yes.

9    Q    And the next -- the next day, with the statement closing

10   date of January 1998 -- do you have that one, Ms. Deaton?

11   A    Yes, I do.

12   Q    And again, it says:  "Are you aware that your Chevy Chase

13   credit card account has fallen past due?  Please pay today."

14   It's in there, right?

15   A    That's right, but every month has a payment.  I'm

16   confused.

17   Q    Then turning to the very next page.  This is the

18   statement dated February 1998.  This is the month that you got

19   that notice -- you got your first Privacy Guard credit report,

20   right?

21   A    Correct.

22   Q    And on this one it says:  "As of this statement, your

23   balance exceeded your credit line.  Please remit the over

24   credit line amount immediately."  Is that correct?  Did I read

25   it right?

1    A    Yes.

2    Q    And on the next page, which is the account summary with a

3    statement closing date of March 1998, do you have that page,

4    Ms. Deaton?

5    A    Yes.

6    Q    That one again says:  "Are you aware that your Chevy

7    Chase credit card account has fallen past due.  Please pay

8    today."

9    A    Right.  We had stopped payments.

10   Q    Then if you will turn two pages.  I'm looking at the

11   statement closing date of April -- April 10th, 1998.  Do you

12   have that one, Ms. Deaton?

13   A    Yes, ma'am.

14   Q    The address that this one is sent to is now a -- a Rancho

15   Mirage, California address; is that right?

16   A    Correct.

17   Q    P.O. Box 2351; is that right?

18   A    That's right.

19   Q    Whose address is that?

20   A    Kamran.

21   Q    So he's still getting the credit card statements, right?

22   A    Yes, ma'am.

23   Q    And on this one, it says in that informational area:

24   "Your charging privileges are temporarily suspended.  Send the

25   amount due today or call us."  Isn't that correct?

1    A    Yes, ma'am.

2    Q    And then on the next page, which is the May 12th, 1998

3    statement, again sent to Rancho Mirage.  So Mr. Hariri got

4    this one, right?

5    A    Yes.

6    Q    It says, in the informational line:  "Your charging

7    privileges are permanently revoked.  Please contact us to

8    discuss payment options"; is that correct?

9    A    Correct.

10   Q    Then if you turn the page to the statement closing date

11   of June 1998.  Do I have the right one up there?  One is dated

12   June 1998, again went to Rancho Mirage, correct?

13   A    Correct.

14   Q    And this one says:  "Your account continues to remain

15   seriously delinquent.  Please contact us."  Right?

16   A    Correct.

17   Q    Then we turn over a few more pages to the September 1998

18   statement.  And this one went to the Rancho Mirage address,

19   correct?

20   A    Correct.

21   Q    And this one doesn't have a line under that new balance

22   thing, there's nothing in that informational box this time,

23   but if you look down farther on the page to transactions,

24   there's -- there are two lines of entry, one says:  "Charge

25   off account principal, $6,116.98."  Do you see that?

DEATON - CROSS                                    3-162

1    A    You said statement closing date 9/11/98?

2    Q    I believe it's 9/21/98.

3    A    Okay.  I heard the nine, so I was not on that page.  I've

4    got 9/21/98.

5    Q    Okay.  If you go down to the transaction area of the

6    document.

7    A    Yes, ma'am.

8    Q    There's two lines there.  The first line says:  "Charge

9    off account principals, $6,116.98."  Right?

10   A    That's what it says.

11   Q    And "charge off account finance charges, $1,737.21,"

12   right?

13   A    That's what it says.

14   Q    Okay.  And then if you would turn to the statement

15   closing date of January 13th of 1999.  That one again goes to

16   Rancho Mirage, right?

17   A    Correct.

18   Q    The only thing of interest here is, it says Chevy Chase

19   Bank here, right?  That's where you're getting the credit card

20   statement from, right?

21   A    Correct.

22   Q    If we go to the next page, your next account statement

23   with a closing date of February 1999 -- I think I had the

24   wrong page up there.  There we go.

25        It's now a First USA account, right?

1    A    Yes.

2    Q    Okay.  You have learned along the way that Chevy Chase,

3    the account was bought by First USA, correct?

4    A    Correct.

5    Q    So all during that period Mr. Hariri was getting all of

6    these statements that had the notices of write-offs or

7    delinquencies; they were going to his address, correct?

8    A    Correct.

9    Q    Ms. Deaton, going back to an exhibit that you went over

10   with your attorney, your Exhibit Number 18 --

11         MS. MARTIN:  And I will ask for an agreement of

12   counsel that the document that we identified as Exhibit 206 is

13   identical to your 18, and since I have my 206 on the computer,

14   you agree that I can --

15         THE COURT:  You are not getting that on the record if

16   you want it on the record.

17         MR. PHILLIPS:  Yes.  Yes.  Yes, I agree.

18         MS. MARTIN:  It's an agreement.  Thank you.

19         THE COURT:  You want to let us in on it?

20         MS. MARTIN:  Your Honor, there's just been a

21   stipulation between counsel that --

22         THE COURT:  Yes, but you know -- that's a no-no.  You

23   do that in recess.  What's the -- we got a lot of people

24   sitting around listening and they want to know what it is.

25         MS. MARTIN:  We have just agreed that we have

1    A    Yes.

2    Q    There was a one "over 30" for that Chevy Chase account,

3    correct?

4    A    Only one.

5    Q    And there were -- two of the places showed "over 30" for

6    the Bank of New York account, right?

7    A    What was that?

8         MR. PHILLIPS:  I think that's past due --

9         MS. MARTIN:  Past due 30.

10        THE WITNESS:  What was that?

11   BY MS. MARTIN:

12   Q    On the -- on the Bank of New York trade line?

13   A    Yes, ma'am.

14   Q    You have two of the reporting agencies; we have Trans

15   Union, TRW, which is also known as --

16   A    Experian.

17   Q    Yes, Experian, thank you.  And then we have Equifax,

18   right?

19   A    Yes, ma'am.

20   Q    So for Bank of New York, TRW and Equifax were both --

21   both had picked up a past due of 30 for your Bank of New York

22   account, right?

23   A    Each one picked up one past due of 30.

24   Q    Yes.  Okay.  And then for Liberty House, all the

25   reporting companies picked up past dues for you on that?

1    A    Correct.

2    Q    Picked up one 30 and the other two picked up two 30s,

3    correct?

4    A    Correct.

5    Q    And then there was a -- the next Liberty House account,

6    there was actually five past due 30s, correct?

7    A    That confused me, but it says that, yes.

8    Q    Okay.  Could we clarify, because we have -- we've seen

9    Bank One's name several times here.  There is a Bank One entry

10   here on the next line for an account 5415270, and then we

11   don't know the last part, correct?

12   A    Correct.

13   Q    That's not the account that you're suing these people

14   over, correct?

15   A    That's right.

16   Q    Okay.  Then the -- I don't want to misquote you, but I

17   want to go back, talk about your explanation of the Sears.  My

18   notes say that as to the Sears account, it says:  "Pays as

19   agreed," and you agreed that that was correct, right?

20   A    Yes, ma'am.

21   Q    Can we look over at your Exhibit 66, which is also in

22   evidence, then if you turn to actually 66A, and I don't have

23   this on the computer.  I'm sorry I can't put it up on the

24   screen.  This is -- Exhibit 66 and the following documents are

25   the credit report that you obtained on-line in January 2002,

1    correct?

2    A    Correct.

3    Q    So as of January 2002, the credit reporting companies

4    were picking up that Sears account as an account transferred

5    or sold collection account, showing --

6           MR. PHILLIPS:  What page are you on?

7           MS. MARTIN:  On Page 66A.

8           MR. PHILLIPS:  66A?

9           MS. MARTIN:  Yes.

10   BY MS. MARTIN:

11   Q    And as to that Sears account, it says two times 30 days

12   delinquent, one time 60 days delinquent, and 20 times 90 days

13   delinquent.  Am I reading that correctly off of 66A?

14   A    Yes.

15   Q    And that's the same Sears account, account number 5650152

16   and then they blank out the last numbers.  That's the same

17   Sears account that we were looking at on Page 18E, where it

18   was being reported in February 1998 that it was being pays as

19   agreed, correct?

20   A    Correct.

21   Q    Then on Page 18F, just for clarification, you have -- you

22   were running a balance on your -- at least at the time of this

23   report, you were running quite a balance on the Citibank Visa

24   card, right?

25   A    It says on the report, but, of course, the -- there's one

1    agency has a zero balance.

2    Q    Yes.  But two of them picked it up as -- as running a

3    balance.  We know they're not always consistent, we can tell

4    that from looking at this, right?

5    A    Correct.

6    Q    Okay.  Going over to Page 18H, you have a county tax lien

7    there, and that's against -- you said that was because of your

8    former husband, right?

9    A    Correct.

10   Q    But isn't it true that that tax lien has remained on your

11   credit card history as an outstanding tax lien?

12   A    That's right.

13   Q    And it doesn't say -- there's nothing that says it's not

14   yours; it shows as a tax lien that you owe, correct?

15   A    Correct.

16   Q    Going to Page 18I.  Exhibit -- Page 18I, I want to focus

17   on this summary of your rights under the Fair Credit Reporting

18   Act.  This was the -- the information that you got from

19   Privacy Guard in February of 1998, when you first learned that

20   there was a high account, and there was some concern because

21   of the balance as far as the Chevy Chase account, correct?

22   A    Correct.

23   Q    And you got this document.  At the top of the page it has

24   questions and answers concerning -- regarding your report.

25   And there's a question there that says:  "How do I dispute

1    discrepancies on my credit report?"  Do you see that?

2    A    Yes.

3    Q    And the answer says:  "Contact the credit bureaus

4    reporting the information," right?

5    A    Yes.

6    Q    And then farther down the page on the summary of your

7    rights under the Fair Credit Reporting Act, that's a basis of

8    your lawsuit here is the Fair Credit Reporting Act, right?

9    A    Yes, ma'am.

10   Q    It says there on this line:  "You can find a complete

11   text of the FCRA," the Fair Credit Reporting Act, "15 U.S.C.,

12   Section 1681 to 1681(u) at the Federal Trade Commission's

13   website."

14        You didn't look for that at that time, though, did

15   you?

16   A    I can't recall.

17   Q    Let's go down to the last paragraph, where it says:  "You

18   can dispute inaccurate information with the CRA,"·CRA meaning

19   a credit reporting agency, right, or also known as a consumer

20   reporting agency?  That's what Trans Union, Experian and

21   Equifax are, are consumer reporting agencies; is that right,

22   Ms. Deaton?

23   A    CRA is credit reporting agency.

24   Q    Yeah.  And that's Trans Union, Equifax and Experian,

25   correct?

DEATON - CROSS                                    3-172

1   A    Correct.

2   Q    Okay.  And it says there:  "If you tell a CRA that your

3   file contains inaccurate information, they must investigate."

4        And going down farther, I really want to focus on the

5   sentence that says -- or couple sentences, I know it's hard to

6   read here, but says:  "The CRA must give you a written report

7   of the investigation and a copy of your report of the" -- and

8   if a copy -- I've got to read it from here.  I'm sorry.

9        "The CRA must give you a written report of the

10  investigation" -- do you see where I am reading, Ms. Deaton?

11  A    I see where you are reading, yes, ma'am.

12  Q    Okay.  -- "and a copy of your report if the investigation

13  results in any change.  If the CRA's investigation does not

14  resolve the dispute, you may add a brief statement to your

15  file."

16       Now, my question is, Ms. Deaton:  Isn't it true that

17  when you got this document, this confidential report from

18  Privacy Guard in February of 1998, you did not take any step

19  to add any brief statement to your file concerning the

20  accounts that you have questioned here?

21  A    I wanted the matter cleared up.  I didn't --

22  Q    Isn't it true that you did not ask to have a brief

23  statement added to your credit report concerning these -- this

24  account?

25  A    Would you repeat that?  I take off my glasses and I lose

DEATON - CROSS                                    3-173

1    train of thought, sorry.

2    Q    At the time that you received this Privacy Guard

3    statement, isn't it true that you did not take any steps to

4    have a brief statement added to your account?

5    A    It said I may and I decided I wanted it cleared rather

6    than -- so I did not take the steps.

7    Q    So you didn't add any brief statement to your account?

8    A    Not at that point.

9         MS. MARTIN:  Your Honor, I would like to go through

10   one more exhibit and go through a few details here.

11   BY MS. MARTIN:

12   Q    If you would turn to Exhibit 66, Ms. Deaton.

13        MS. MARTIN:  Your Honor, I believe that Defendant's

14   Exhibit Number 212 is identical to Plaintiff's Exhibit 66, and

15   I would ask that we could use our computerized version of

16   Exhibit 212 to display to the jury.

17        THE COURT:  If it's the same thing, there's no reason

18   why you can't.

19        MS. MARTIN:  Mr. Phillips?

20        MR. PHILLIPS:  That's fine with me.  Please go ahead.

21        MS. MARTIN:  Thank you.

22        THE COURT:  Looks the same to me.

23        MS. MARTIN:  Okay.

24   BY MS. MARTIN:

25   Q    This is that January 2002 credit report, Ms. Deaton,