1     IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF HAWAII

3     _____)
                                     )
4     LINDA DEATON,                  )
                                     )
5               Plaintiff,           )
                                     )   CIVIL NO. 01-352 SPK/BMK
6                                    )
                                     )
7          vs.                       )
                                     )
8     CHEVY CHASE BANK,              )        VOLUME IV
      a corporation, BANK ONE,      )     (Pages 1 - 194)
9     a corporation, and JANE       )
      DOES 1-10 and JOHN DOES       )
10    1-10, DOE CORPORATION 1-10,)
      and DOE GOVERNMENTAL          )
11    ENTITIES 1-10,                )
                                     )
12              Defendants.         )
      _____)

13

14          TRANSCRIPT OF PROCEEDINGS

15

16     The above-entitled matter came on for FURTHER

17   JURY TRIAL commencing at 10:00 a.m. on Thursday,

18   April 17, 2003, Honolulu, Hawaii,

19

20   BEFORE:  HONORABLE SAMUEL P. KING

21           United States District Judge

22           District of Hawaii

23

24   REPORTED BY:  LISA J. GROULX, COURT REPORTER

25             Notary Public, State of Hawaii

1      Honolulu, Hawaii; Thursday, April 17, 2003

2                        -o0o-

3           THE COURT:  Good morning.  We'll

4   continue the cross-examination.

5           MS. MARTIN:  Good morning, Your Honor.

6           THE COURT:  Good morning.

7                 CROSS-EXAMINATION (Resumed)

8   BY MS. MARTIN:

9      Q.   Good morning, Ms. Deaton.

10     A.   Good morning.

11     Q.   Ms. Deaton, I'm going to ask you to go to

12   plaintiff's Exhibits 57 and 58 which were admitted

13   into evidence.

14     A.   (Witness complying.)

15     Q.   And I've got it up on the screen as large as

16   the way we possibly can.  Do you have that in front of

17   you, Ms. Deaton?

18     A.   Yes, I do.

19     Q.   Do you remember this is the letter from

20   Credit Bureau of the Pacific, correct?

21     A.   Correct.

22     Q.   And this is the one that you got in October

23   of 1999 in response to your fax to Vivian in August of

24   1999, right?

25     A.   Correct.

1    Q.    Looking closely, I would like to read through

2    some of the language in this letter so we can clarify

3    what went to whom.

4         Looking at the first line, it says:  "We have

5    reinvestigated the accounts in question and have sent

6    an updated supplemental report to MidPacific Mortgage

7    to expedite the matter."  Did I read that right?  It's

8    the first sentence.

9    A.    Yes, ma'am.

10    Q.    Then it says:  "Enclosed please find a copy

11    of your updated consumer disclosure together with a

12    copy of the supplemental report."  Is that right?

13    A.    Yes, ma'am.

14    Q.    The supplemental report is what they've

15    already defined as the document they sent to

16    Midpacific Mortgage, right?  Isn't that what the first

17    sentence says?

18    A.    Wait.

19    Q.    The first sentence says:  "We have sent an

20    updated supplemental report to MidPacific," right?

21    A.    That's what it says, yes, ma'am.

22    Q.    Okay.  Going over to document 58, and just

23    for clarification for the court, this is one of those

24    exhibits that plaintiffs and defendants marked the

25    same exhibit.  That's why it shows Exhibit 208.  This

1    was marked as 208 for defendants.  I don't want to

2    confuse anybody to think we're putting something else

3    up there.

4                    THE COURT:  So 58 is also --

5                    MS. MARTIN:  Is also part of --

6                    THE COURT:  208.

7                    MS. MARTIN:  -- defendant's 208.

8    Plaintiffs 57 and 58 are identical to defendants 208.

9         Q.    (By Ms. Martin) Now on this document, this

10   one marked 58 is actually addressed to MidPacific

11   Mortgage, correct?

12        A.    Correct.

13        Q.    And this document contains certain

14   information that was sent to MidPacific Mortgage,

15   right?

16        A.    I would assume so, yes, ma'am.

17        Q.    And the information that's contained there

18   includes a Chase account, right?

19        A.    That's correct.

20        Q.    And a Liberty House account, right?

21        A.    That's right.

22        Q.    And it also contains a First U.S.A. Bank

23   account, right?

24        A.    That's right.

25        Q.    But that's not the account that you sued

1    about here, is it?

2        A.    No.

3        Q.    Okay.  And that also includes a tax lien,

4    right?  That state tax lien that is on record against

5    you is listed there, correct?

6        A.    I'm looking for it, ma'am.

7        Q.    Okay.

8        A.    Yes, ma'am, it is.

9        Q.    And if you would turn to page 58A, this is a

10   continuation of the supplemental report that was sent

11   to MidPacific Mortgage, right?

12       A.    That's what it looks to be.

13       Q.    And this contains -- again, has that state

14   tax lien listed, right?  Do you see that on there?

15       A.    That's what I'm looking for.  There's a

16   little bit of glare, so excuse me.

17                    THE COURT:  What exhibit are we on now?

18                    MS. MARTIN:  58A, Your Honor.

19       A.    Remarks:  Public record.  State tax lien.

20       Q.    (By Ms. Martin) So that shows on that page

21   also.

22             Now on pages Exhibit 58 and 58A, are the ones

23   that were sent to MidPacific Mortgage, right?

24       A.    Yes, ma'am.

25       Q.    No where on these pages is the Chevy

1  Chase/First U.S.A. account that you're complaining of

2  here; isn't that correct?

3      A.    There was no change.  That's right.

4      Q.    Wait.  On these two pages, there's no

5  reference to the account that you've complained about

6  here; is that correct?

7      A.    Correct.

8              MR. PHILLIPS:  Your Honor.

9              THE COURT:  Yes.

10             MR. PHILLIPS:  Your Honor, could I

11  change the mic?  I can't see my client's face.  The

12  mic is --

13             THE COURT:  What do you want to change?

14             MR. PHILLIPS:  The mic, so that it's not

15  sticking -- it was right in her face.

16             THE WITNESS:  It's right in my face.

17             THE COURT:  We'll take care of it.

18             MR. PHILLIPS:  All right.  Thank you

19  very much.

20             THE COURT:  I hope.  If Leslie can't fix

21  it, it's broken.

22             MR. PHILLIPS:  Ms. Sai --

23             THE CLERK:  Just a minute, Mr. Phillips.

24  One second.  There.  Is that better?  Can you see her

25  now?

1              MR. PHILLIPS:  That's very good.  Thank

2    you very much.  Perfect.

3         Q.   (By Ms. Martin) Thank you.  Now, Ms. Deaton,

4    if you would turn to page 58B.

5         A.   58B?

6         Q.   Yes.

7         A.   (Witness complying.)  Okay.

8         Q.   And referring back to 57, the second sentence

9    on document 57 says:  "Enclosed please find a copy of

10   your updated consumer disclosure," correct?

11        A.   Yes.

12        Q.   And if you turn to 58B.

13              THE COURT:  B?

14              MS. MARTIN:  That's correct, Your Honor.

15        Q.   (By Ms. Martin) This is the updated consumer

16   disclosure, right?

17        A.   Yes, ma'am.

18        Q.   But this is only addressed to you; isn't that

19   right?

20        A.   That's correct.

21        Q.   It does not indicate that it was sent to

22   MidPacific Mortgage, right?

23        A.   That's correct.

24        Q.   And this is the document that includes a

25   confirmation of a charge-off as to the First U.S.A.

1    account, right?

2         A.   Yes.

3         Q.   But it also includes, on this updated

4    disclosure, that there's an account closed by Credit

5    Granter with City Bank?

6         A.   That's right.

7         Q.   And it also has a Sak's Fifth Avenue account

8    with a prior paying history showing one period of 30

9    or over, correct?

10        A.   Could you tell me -- I mean --

11        Q.   Looking down, if you -- see where I'm

12   pointing with the pointer up here?

13        A.   That's what I was looking at.

14        Q.   It's hard to --

15        A.   Yes, I see it.

16        Q.   It's hard to keep the dot steady here.

17             So there's a delinquent account showing with

18   Sak's Fifth Avenue, correct?

19        A.   One time, 30 days, yes.

20        Q.   But this information didn't go to MidPacific

21   Mortgage, to the best of your knowledge, right?

22        A.   They already had it.

23        Q.   But with this supplemental report that went

24   to MidPacific does not have anything for First U.S.A.

25   or Chevy Chase?

1    A.    Correct.

2    Q.    And we're referring to pages 58 and 58A?

3    A.    Correct.

4    Q.    When you were asked to provide documents for

5  this case, we asked for everything that was relevant

6  to this proceeding, correct?

7    A.    Yes, ma'am.

8    Q.    You haven't provided us anything that shows

9  that MidPacific Mortgage had any information other

10  than what is in pages 58 and 58A; isn't that right?

11    A.    If you'll look on that page.

12    Q.    Which page are you looking at?

13    A.    38B.

14              THE COURT:   58B.

15              THE WITNESS:   58B, yes, ma'am.   Yes,

16  sir.  I'm nervous.

17    Q.    Yes?  58B, where do you see --

18    A.    Okay.  If you look at the bottom, you look at

19  the inquiries --

20              THE COURT:   Companies that requested

21  your credit history.

22              THE WITNESS:   Yes, sir.  And if you'll

23  look down on 125 on 99, that MidPacific did inquire at

24  that point in time.

25    Q.    (By Ms. Martin) Does that show what they saw

1    or only that they made an inquiry?

2         A.    That they made an inquiry.

3         Q.    But it doesn't show what they ever saw as to

4    your credit report, does it?

5         A.    No, ma'am.

6         Q.    Okay.  Following your August 1999 letter to

7    MidPacific, the documents that are marked as Exhibits

8    57 and 58 are the only documents that you received

9    back from MidPacific as a result of your inquiry,

10   correct?

11        A.    It's only the ones that I had in my folder.

12   I don't know.  I could have gotten some other sheets.

13        Q.    These are the only ones that you were able to

14   produce; isn't that correct?

15        A.    That's right.

16        Q.    And MidPacific did not give you instructions

17   as to how to enter any kind of comment on your credit

18   report, did they?

19        A.    That I can't recall having the sheets but if

20   I got them I probably put them to the side.  Because,

21   to me, I already had copies of that from the Privacy

22   Guard.

23        Q.    But you didn't get it from MidPacific; isn't

24   that right?

25        A.    I cannot say that, no, ma'am.

1    Q.    You don't recall if you saw something or

2    you're sure you didn't see anything?

3    A.    Would you restate the question, please,

4    ma'am?

5    Q.    I'll try and make it simpler.

6    A.    Okay.  Thanks.

7    Q.    Isn't it true that the only writing that you

8    got from MidPacific in October of 1999, or, as a

9    result of your August '99 inquiry, are the documents

10   identified as Exhibits 57 and 58?

11   A.    I can't say that's the only documents, no,

12   ma'am.

13          THE COURT:  Are you excluding 58 A, B,

14   C, D?

15          MS. MARTIN:  No.  I'm sorry, Your Honor.

16   I mean those in total.

17          THE COURT:  58 with all of its sub A, B,

18   C?

19          MS. MARTIN:  Yes, Your Honor.

20   Q.    (By Ms. Martin) Ms. Deaton, do you still have

21   your deposition transcript handy or has that been

22   removed?

23          THE CLERK:  She has it right there.

24   Q.    Would you turn to page 184 of your deposition

25   transcript, please?

1    A.    (Witness complying.)

2    Q.    I'm going to read starting at line 8 through

3   14.

4                    "Q.  This October 11, 1999 letter from

5                    the Credit Bureau of the Pacific, with

6                    whatever attachments were included, is

7                    this the last piece, the only piece --

8              THE COURT:  You know, you can always

9   read a deposition faster than the court reporter can

10   copy it.

11              MS. MARTIN:  I'm sorry.  I speak fast.

12              THE COURT:  Well, you're not the only

13   one.  Everybody who starts in with a deposition just

14   goes brrrrrr.

15              MS. MARTIN:  I'll start again.

16              THE COURT:  Yeah.  Why don't you.

17                    "Q.  This October 11, 1999 letter from

18                    the Credit Bureau of the Pacific, with

19                    whatever attachments were included, is

20                    this the last piece, the only piece or

21                    notice letter, correspondance or writing

22                    that you received from Credit Bureau of

23                    the Pacific after your request to them

24                    to investigation or reinvestigate your

25                    credit reports?

1          "A.  I believe it is.

2      Q.    They did not sent you a copy -- did I read

3  that correctly?

4              MR. PHILLIPS:  Your Honor, could I ask

5  her to read --

6              THE COURT:  Just a minute.

7              MS. MARTIN:  Just I ask her to answer

8  the question?

9              THE COURT:  Just a minute.

10              MR. PHILLIPS:  That's not a complete --

11              THE COURT:  Is there an objection?

12              MR. PHILLIPS:  Yes, Your Honor, that she

13  should be directed to read the next two question and

14  answer lines 15 and 16.

15              THE COURT:  You'll get a chance.

16              MR. PHILLIPS:  All right, Your Honor.

17      Q.    (By Ms. Martin) Did I read that correctly?

18      A.    That part.

19      Q.    Yes.

20              THE COURT:  Now he wants the next two

21  questions and answers and he's entitled to have them

22  asked at the same time.

23              MS. MARTIN:  I'm sorry.  I already lost

24  the page.  Okay.

25      Q.    And the next question:

1          "Q.  Okay.

2          "A.  To the best of my recall.

3    Did I read that correctly?

4        A.  Right.

5        Q.  So you don't recall ever getting any

6    instructions from the Credit Bureau of the Pacific

7    that informed you how to enter a line on your credit

8    report disputing an entry; is that correct?

9        A.  That was a long question.  Could you reask

10   it?

11       Q.  Is it true that you have no recollection of

12   receiving instructions from Credit Bureau of the

13   Pacific as to entering a line in your credit report

14   disputing an entry?

15          The basic question is:  Did you get any other

16   instructions -- you don't recall getting anything else

17   from the credit Bureau of the Pacific, correct?

18       A.  I cannot recall for sure.

19       Q.  You didn't write anything to the credit

20   reporting agencies to put an entry line in your credit

21   report at that time, did you?

22       A.  No, ma'am.

23       Q.  Going back to the document identified as

24   number 57.  On this document, the letter from the

25   Credit Bureau of the Pacific, also says in the last

1  sentence of the second paragraph -- or let's start at

2  the middle of the second paragraph:  May we suggest

3  that you contact both credit reporting agencies to get

4  a copy of your credit history report.  Listed below

5  for your convenience are the addresses for you to

6  obtain a copy of that report.  Do you see where it

7  says that in Exhibit 57?

8       A.   Yes.

9       Q.   And then it gives the addressees for Experian

10  and TransUnion, correct?

11      A.   Correct.

12      Q.   You didn't, at that time, did not write to

13  either of those credit reporting agencies for a copy

14  of your credit report, correct?

15      A.   Correct.

16      Q.   The loan that you were seeking for MidPacific

17  Mortgage was approved, correct?

18      A.   It would have --

19      Q.   Yes or no?

20      A.   Yes.

21      Q.   Thank you.  Let's turn over to your Exhibit

22  59.

23      A.   (Witness complying.)

24      Q.   59 is the American Savings Bank denial of a

25  preferred credit line, correct?

1    credit reports from Equifax and TransUnion in early

2    2002 that indicated that the charged-off line did

3    still show as to the First U.S.A./Chevy Chase account,

4    correct?

5        A.    Yes, ma'am.

6        Q.    But isn't it true that shortly thereafter it

7    was completely deleted from your credit report and it

8    does not show as of this day and as of several months

9    ago?

10       A.    Would you repeat that again?

11       Q.    Isn't it true that that credit line was

12   completed deleted?

13       A.    Yes.

14       Q.    And it has been deleted for several months,

15   correct?

16       A.    Yes.

17              THE COURT:  After you filed suit?

18              THE WITNESS:  Yes, sir.

19       Q.    (By Ms. Martin) Ms. Deaton, I want to try and

20   get a little bit of a scenario together here, one last

21   piece.  You got the credit card in 1990, correct?

22       A.    Yes, ma'am.

23              THE COURT:  You mean the one in question

24   or --

25              MS. MARTIN:  Yes, the one in question,

1  Your Honor.  Thank you.

2       Q.    In fact, you've actually marked the

3  application as your Exhibit 100.  We don't need it in

4  evidence, unless counsel wants to put it in.  But it's

5  marked October 27, 1990; does that sound correct?

6       A.    Yes, ma'am.

7       Q.    And that was only with your own name,

8  correct?

9       A.    That's right.

10      Q.    You didn't apply for any joint account at

11 that time, correct?

12      A.    I can't recall.

13              THE COURT:  Well, you got the exhibit

14 here.  It doesn't --

15      Q.    I'll ask you to turn to your Exhibit 100.

16      A.    On that application, no, it doesn't say that.

17      Q.    Isn't it true that Mr. Hariri was not an

18 obligee on that account when you got the credit card,

19 correct?

20      A.    He never has been.

21              THE COURT:  He never has been what?

22              THE WITNESS:  An obligee.  Obligee is

23 somebody that has to pay the bill; is that right?

24      Q.    (By Ms. Martin) I believe that's correct.

25      A.    Okay.

```
 1        Q.    He has never been the responsible person for
 2   paying --
 3        A.    Cosigner or signer.
 4              THE COURT:  He never has been.
 5        Q.    He's never been the responsible party, right?
 6        A.    Correct.
 7              THE COURT:  Well, they sent him bills
 8   and everything.
 9              THE WITNESS:  I know.
10              THE COURT:  Is that more male
11   chauvinism?
12              THE WITNESS:  I don't know what it is.
13              THE COURT:  You don't know why they sent
14   them to him?
15        Q.    (By Ms. Martin) Well, you knew Mr. Hariri at
16   the time that you did get the card, right?
17        A.    Yes, I did.  Yes, I do.  Excuse me.
18        Q.    Did you give him the card, one of the cards
19   -- did you get two cards when you first got the
20   account?
21        A.    I can't recall, Ms. Martin.  I really can't.
22        Q.    Do you remember when you first gave him the
23   card?
24        A.    No, ma'am
25        Q.    Was it in 1991, about when he conveyed that
```

29

1  Waiau Gardens apartment to you?

2      A.    It probably was before.  It was approximately

3  in that same time frame of when I applied for the

4  card.

5      Q.    His credit --

6              THE COURT:  You didn't have to note him

7  as a co --

8              THE WITNESS:  I'm sure it did happen

9  with a form that was sent in at a later point in time.

10             THE COURT:  Some kind of form that

11  allowed his signature?

12             THE WITNESS:  Otherwise, they wouldn't

13  have let him sign, I wouldn't think.

14             THE COURT:  Well, unless somebody stole

15  the card and used it.

16             THE WITNESS:  Could have been.  No.

17     Q.    (By Ms. Martin) Isn't it true, Ms. Deaton,

18  that Mr. Hariri's credit was never effected by

19  anything to do with this account?

20     A.    That's right.  I would think so.

21     Q.    You would think so or you would know so?

22     A.    I haven't --

23             MR. PHILLIPS:  Well, Your Honor --

24     A.    -- looked at his credit report, you know.

25     Q.    Ms. Deaton, would you turn, in your

1  deposition, to page 116?

2      A.    (Witness complying.)

3          MR. PHILLIPS:  Your Honor, I'm going to

4  object to any further questions about Mr. Hariri's

5  credit.  She's testified that he wasn't an obligor on

6  this account and therefore irrelevant.

7          THE COURT:  That doesn't mean she can't

8  question her about it.  Just because she said so

9  doesn't mean it's true.

10          MR. PHILLIPS:  All right, sir.  Very

11  good.

12          THE COURT:  You may proceed, Ms. Martin.

13  That's up to the jury to figure out.

14          MS. MARTIN:  Thank you.

15      Q.  Page 16 of your deposition, I'm going to

16  start at line 5 and go through line 13.

17          MR. PHILLIPS:  Your Honor, let me --

18  would the court review this, because I think this is

19  getting into an area that the court already ruled on.

20          THE COURT:  Let me see the exhibit.

21          MR. PHILLIPS:  Yeah.  Let's let the

22  court review it, Ms. Martin, if you don't mind.

23          THE COURT:  Which lines?

24          MR. PHILLIPS:  I'm interested in 10 and

25  11, Your Honor.  I have no problem up to line 9.

1               MS. MARTIN:  Your Honor, on line 10 I

2   will use the word "so" and skip the rest of that line.

3               THE COURT:  What lines to you want to

4   read?

5               MS. MARTIN:  On line 10, I will read the

6   word "so" and skip the rest of that line.

7               MR. PHILLIPS:  "So he's not a party to

8   this," is that what you're talking about?

9               MS. MARTIN:  Yes.

10              THE COURT:  You may proceed, Ms. Martin.

11     Q.   (By Ms. Martin) Starting at line 5.

12     A.   Which line?

13     Q.   Line 5.  And we were talking about Mr. Hariri

14  at the time; do you agree?

15     A.   Yes, ma'am.

16     Q.   To put it in context.

17         "Q.  Was his credit ever affected?

18         "A.  It was basically -- he was a sub

19            signer.  It was just my information.

20         "Q.  So --

21         "A.  I'm responsible.

22         "Q.  So he's not party to this because

23            he's never --

24         "A.  Right.

25         "Q.  -- had any problems?

32

1   There was an interruption there.  If we read that last

2   part without the interruption, "So he's not party to

3   this because he's never had any problems.  Answer:

4   Right.

5           Did I read that correctly?

6       A.   Correct.

7       Q.   So, by 1993, when the alleged errors

8   occurred, Mr. Hariri was using the card at that time,

9   correct?

10      A.   We both had, yes.

11      Q.   He was using the card, correct?

12      A.   He was using the card.

13      Q.   We have an exhibit where you wrote the

14  words --

15              MR. PHILLIPS:  Um --

16              THE COURT:  She said he was using the

17  card.

18              MR. PHILLIPS:  I'm sorry.  I'll wait for

19  the question.

20      Q.   (By Ms. Martin) He was receiving the bills at

21  that time, correct?

22      A.   Correct.

23      Q.   You were not using the account, correct?

24      A.   I had access to it.

25      Q.   You weren't using it, correct?

```
 1       A.   I don't recall ever putting --

 2                 THE COURT:  You might have but you

 3  weren't trying to?

 4                 THE WITNESS:  I tried not to.

 5                 THE COURT:  But you could have if you

 6  wanted to?

 7                 THE WITNESS:  Yes, sir, I could have.

 8       Q.   (By Ms. Martin) Ms. Deaton, would you turn to

 9  Exhibit 53D?

10       A.   (Witness complying.)

11       Q.   It is in evidence.  This is part of your

12  transmittal to the Credit Bureau of the Pacific,

13  correct?

14       A.   Right.

15       Q.   Please correct me if I read this sentence

16  wrong.  I'm starting on the third line at the word

17  "I." "I have never charged with this card.   Only

18  Mr. Hariri."  Did I read that correctly?

19       A.   That's correct.

20       Q.   And you sent that to the Credit Bureau of the

21  Pacific, right?

22       A.   Yes, ma'am.

23       Q.   Thank you.  So, back in 1993, when he was

24  using the card, he was receiving the bills and you

25  were not using the account?  You'd essentially
```

1    A.    Yes, ma'am.

2                THE COURT:    For tax purposes.

3                THE WITNESS:    For tax purposes.

4    Q.    Yes, tax purposes.    And you filed this

5    lawsuit in 2001, right?    May of 2001?

6    A.    Yes.

7    Q.    And Chevy Chase and First U.S.A. were served

8    in July or August of that year, correct?

9                THE COURT:    Whatever the record shows.

10   A.    Yes.

11   Q.    And they were only able to provide copies of

12   statements for the 7 years immediately prior to their

13   being identified.    You've seen it in Exhibit 209,

14   correct?

15   A.    Seven years from a August of '94.

16   Q.    Correct.    Actually, if you go back to Exhibit

17   209, that very first page, the statement closing date

18   is July of '94, correct?

19       You can look at the exhibit if you'd like.

20   A.    I'll accept what you said.

21   Q.    All right.    So First U.S.A. and Chevy Chase

22   were able to provide the statements going back to July

23   of 1994, correct?

24   A.    Let me look at that document, okay?

25   Q.    Certainly.

1    A.    209.    And I think it was the end page.

2  You're right.    Closing date 7/12/94.    Is there two

3  dates you're concerned?    Closing date and payment due

4  date.

5    Q.    And we've seen in evidence the billing

6  statement of January 12th of 1994, correct?

7    A.    Correct.

8    Q.    And you've provided us the billing statement

9  of February 10th, 1994, correct?

10    A.    Correct.

11    Q.    And you've provided us the billing statement

12  of March 11th, 1994, correct?

13    A.    Yes.

14    Q.    We haven't seen anything in between those

15  dates, correct?

16    A.    That's right.

17    Q.    You don't have them, do you?

18    A.    No, ma'am, I don't.

19    Q.    Yesterday you testified that shortly after

20  the April 24th letter that you sent to Chevy Chase

21  that you called them.

22    A.    Yes, ma'am.

23    Q.    And you told them you wanted to close the

24  account, correct?

25    A.    Cancel, yes.

37

1      Q.   And you said yesterday, I believe, that the

2    bank said "wait," correct?

3      A.   Correct.

4      Q.   Now the missing statements you don't have and

5    the banks were not able to produce, correct?

6      A.   I didn't keep them.

7      Q.   Well, they were sent to Mr. Hariri, correct?

8      A.   Yes.

9      Q.   As you sit here today, you have nothing to

10   show exactly what happened in those three billing

11   cycles, correct?

12     A.   That's right.

13     Q.   So, as you sit here today, Ms. Deaton, you

14   have no written document which can prove that those

15   errors were not reversed, do you?

16     A.   If you're looking for the copies of the

17   statements, no, ma'am, I don't have those.

18     Q.   So you have no documents that would show the

19   errors were reversed?

20               THE COURT:  That's pretty argumentative.

21               MS. MARTIN:  I'm asking if she has the

22   documents, Your Honor.

23               THE COURT:  You've got the report that

24   they're still claiming it's owed.

25     Q.   Ms. Deaton, isn't it --

38

1  THE COURT:  Do you have any bank

2  accounts?

3  THE WITNESS:  Sir?

4  THE COURT:  Any bank accounts?

5  THE WITNESS:  Yes, sir.

6  THE COURT:  Reports.

7  THE WITNESS:  Not the credit card

8  reports that she's referring to.

9  Q.  (By Ms. Martin) Ms. Deaton, isn't it possible

10  that they were reversed in one of those periods and

11  new charges incurred?

12  A.  I don't feel that they were, no, ma'am.

13  Q.  But you don't have the statements to show

14  that that didn't happen, do you?

15  A.  I had looked at them and they were not

16  reversed.

17  Q.  Ms. Deaton, you don't have them to show that

18  they were not reversed?

19  A.  I don't, but I did review the statements.

20  Q.  They were not sent to you, were they?

21  MS. MARTIN:  That's hearsay.  I move to

22  strike that answer, Your Honor.

23  THE COURT:  Well, we're getting into a

24  big argument now.  You're saying they're reversed.

25  She's answered the question.

1          MS. MARTIN:  Your Honor, she's testified

2  the statements were not sent to her, they were sent to

3  Mr. Hariri.

4          THE COURT:  I'll let it stand.

5     Q.   (By Ms. Martin) But you don't have those

6  statements, correct?

7     A.   No, ma'am, I don't.

8          MS. MARTIN:  Thank you.  I have nothing

9  further at that time.

10         THE COURT:  We'll take a 10 minute

11  recess.

12         (Whereupon the jury departed from the

13  courtroom.)

14         THE COURT:  Not the absence of the jury.

15     You have a problem, Mr. Phillips?

16         MR. PHILLIPS:  Yes, Your Honor.  I would

17  like to --

18         THE COURT:  Don't go away, Ms. Martin.

19  He's going to raise something.

20         MR. PHILLIPS:  Yes, Judge.  What I'd

21  like to do is make a motion to correct the record.

22  Over the last evening's break, I reviewed the motion

23  in limine that was filed by the defendants to keep out

24  any evidence of claims which were dismissed, and I

25  reviewed our opposition to that motion.

1    A.    The charges that we have spoken of here.

2  They're the largest ones with the hotel,

3  InterContinental Hotel, $447.50.    It repeats four

4  times.

5              THE COURT:    Five times, actually.    Once

6  the day before and four times the next day.

7    Q.    So those are the billing errors that you're

8  referring to, January 1994?

9    A.    I'm sorry, Your Honor.

10             THE COURT:    There was a charge of 475

11  the statement before which was paid and then four

12  charges on the next statement.

13             THE WITNESS:    Yes.    That's how it was.

14  I meant the four on the January statement.

15             THE COURT:    So all together there were

16  five, one of which was paid.

17             THE WITNESS:    Yes.    And that's clearly

18  the way he listed it in his letter.

19    Q.    (By Mr. Chapman) So when I refer to the

20  billing error in January 1994, that's the subject that

21  you're speaking about?

22    A.    Yes.

23    Q.    Now what is your position with regard to that

24  alleged billing error on the Deaton's account?

25    A.    That Chevy Chase was notified -- Mr. Hariri

1   sent us two letters, one in January.  The letter he

2   sent us in January was addressed to our statement

3   address, which is essentially where we collected all

4   of our payments and it was not an address that we read

5   letters at.  Customers that send attachments with

6   their bills, we did not necessarily read them on a

7   timely basis, which is why, on the back of our

8   statement, we specifically ask for any disputes around

9   billing to come to a specific address so we can make

10  sure we research them on a timely basis.  So when the

11  March letter was sent certified and we received it --

12          THE COURT:  March 19 --

13          THE WITNESS:  Thank you.  March 1994

14  letter was sent to us, that we received April 5th, I

15  believe that we researched it.  I believe that we

16  corrected the error.  And I believe on the May or June

17  statement that the balance was corrected.

18          And the reason I believe that is that while

19  we received one letter from Mr. Hariri in January and

20  perhaps two letters from him in March, we didn't hear

21  from him again until February of 1998.

22      Q.  (By Mr. Chapman) If that alleged billing

23  error had been corrected, where would the corrections

24  have appeared?

25      A.  The correction would have appeared as a

1    credit on the statement associated with that account

2    which would have been mailed to the address on the

3    account.   It would have just shown a line item credit

4    in the total of $1,902 correcting the previous errors.

5                    THE COURT:   And that would have been

6    done in what month?

7                    THE WITNESS:   That would have been done,

8    since we had formal notification that we received on

9    April 5th, 1994, would have occurred on the statement

10   that closed May 10th or June 10th, just as a standard

11   process for how we followed up on that.   And since we

12   did not hear again from Mr. Hariri concerning the

13   dispute, I believe it was corrected on that statement

14   and that's why we didn't hear from him again.

15       Q.    (By Mr. Chapman) If that billing error --

16   alleged billing error had been corrected, how would

17   that have changed the computer's coding of the account

18   of Linda Deaton as a disputed balance account?

19       A.    I'm sorry?

20       Q.    If the error had -- alleged error had been

21   corrected, as you testified, how would the computer

22   change the coding or effect the disputed balance

23   account coding on Linda Deaton's account?

24       A.    If the balance had been corrected, the

25   balance would have remained on the -- we would have

1    removed it from our suspense account and reversed it,

2    corrected the error, and it would have been purged

3    from any average balance calculation used to derive

4    the finance charges on Ms. Deaton's account.

5              So it essentially would have appeared -- from

6    a statement point of view, it would not have been

7    there.  It would not have had any influence on the

8    finance charges or any payment.

9              THE COURT:  Do we have an exhibit that

10   shows that?

11             MR. CHAPMAN:  No, Your Honor.

12        Q.   The court asked if we have an exhibit which

13   shows that.

14        A.   We do not have a May or June statement.

15        Q.   And why not?

16             THE COURT:  The earliest one seems to be

17   July '94.

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  Payment due by August 6,

20   '94.

21             THE WITNESS:  August 6th.  The July 10th

22   statement date.

23        Q.   (By Mr. Chapman) If you know the answer.

24        A.   Oh, if I know?

25        Q.   If not, I can ask our next witness.

121

1    THE COURT:  Well, at least that doesn't

2  show 1,900 and something other carrying forward, does

3  it?

4    Q.   I think the court's question and my question

5  -- my next question are the same.

6    THE COURT:  If it does, the balance

7  $2,393.64 -- yeah.  Go ahead.

8    Q.   If, as you testified, Mr. Fitzgerald, the

9  billing error was corrected in May or June of 1994,

10  how would there be a balance carried forward into the

11  July or August statement in 1994?

12    A.   The account was open to purchases and the

13  customer was free to use that account at any

14  mastercard or visa merchant up to their available

15  credit line.  And as long as the minimum payments were

16  made, the $2,300 was well within the credit line of

17  the account.  So the account was, what we call, open

18  to buy and able to have a balance of $2,300.

19    So there would could have any number of

20  transactions on the June statement or May statement on

21  top of the credit that could have created a $2,300

22  undisputed balance.

23    THE COURT:  You don't know whether that

24  includes 1,700 and -- whatever it is -- 1,902 or not?

25    THE WITNESS:  We need two previous

1    statements to know what it does or doesn't include.

2    Because each statement will include, in detail, all of

3    the transactions for that month that create the new

4    balance so we'd know how the balance was created.  But

5    absent that, we can't tell.

6        Q.    (By Mr. Chapman) Assuming the billing error

7    in 1994 was corrected, as you've testified, how would

8    you account for the fact that the balance had grown to

9    almost $7,500 by 1998 when it was charged off?

10        A.    In looking through the rest of these

11    statements, there's a steady usage of the account on a

12    monthly basis at restaurants, at rental car agencies,

13    at hotels, just using the plastic where it's honored.

14    There are payments that are associated with each

15    statement but because those payments did not pay off

16    the previous month's balance, the unpaid portion of

17    the previous month's balance earned additional finance

18    charges and, over time, the combination of payments --

19    I mean the combination of purchases and finance

20    charges would grow a balance.  That's the credit card

21    business.  That provide s a convenient credit vehicle

22    for consumers to shop conveniently.

23        Q.    Now it's your testimony, Mr. Fitzgerald, that

24    no one has those missing statements; is that correct?

25        A.    That is correct.  Chevy Chase Bank does not

1  have any of the statements and Bank One does not have

2  the statements either.

3      Q.    Have you considered an alternate theory where

4  the billing error was not corrected?  Have you

5  considered that?

6      A.    Yes.  Not knowing, absent the May or June

7  statements, one of two things happened; either it was

8  corrected or it wasn't.

9      Q.    So if it was corrected, as you've testified,

10  the account balance grew through normal use?

11      A.    Correct.  It's a completely valid legitimate

12  balance because there -- yes.  Because that system, it

13  created and maintained that balance, if it was all

14  valid, serviced two and half million customers for

15  years.

16      Q.    If it was not corrected, would you be able to

17  calculate what the undisputed portion of the account

18  balance was by September 1998?

19      A.    Yes.

20      Q.    And how would you do that calculation?

21      A.    Using the statements that we have available,

22  and presuming that the July 10th statement was the

23  first statement on the account and there was no

24  beginning balance, which would presume that the 2,393

25  balance was made up entirely of the disputed balance

1   and associated fees and finance charges related to

2   that, I created -- just taking that as the base line,

3   starting from zero on July 10th and adding new

4   purchases, subtracting payments and where the payments

5   did not pay off the previous month's balance and

6   therefore earning finance charges.

7        Q.   Have you made a calculation on that basis?

8        A.   Yes.

9             MR. CHAPMAN:  Your Honor, may I direct

10   the witness' attention to what's marked for

11   identification as defendants' Exhibit 224?

12             MR. PHILLIPS:  Your Honor --

13             THE COURT:  Mr. Phillips.

14             MR. PHILLIPS:  Yes.  I would like to

15   object to this.  We have not been provided -- in fact,

16   I wasn't provided this until this morning.

17             THE COURT:  224?

18             MR. PHILLIPS:  224.

19             MR. CHAPMAN:  224.

20             THE COURT:  Your problem is you haven't

21   had it before?

22             MR. PHILLIPS:  I haven't seen it before.

23   I haven't heard any of this testimony.  No, I haven't

24   seen it before.

25             THE COURT:  We'll take it up at the

1    recess, if you need, after he's testified.

2             MR. PHILLIPS:  Well, to do what?

3             THE COURT:  He created it.  He can do it

4    now.  We could take the time to have him sit here and

5    go through it but he's already done it in advance for

6    us.

7             MR. PHILLIPS:  Your Honor, I would

8    object, just for the record, that these exhibits were

9    provided to me this morning, as I'm sure will be in

10   evidence, it's a very complex document.

11            THE COURT:  Overruled.

12            MR. PHILLIPS:  And there was no prior

13   disclosure of this information.

14            THE COURT:  Overruled.  You can

15   cross-examine him.

16            MR. PHILLIPS:  Very good, Your Honor.

17            THE COURT:  We're not going to have him

18   do it from scratch.

19            MR. CHAPMAN:  Thank you, Your Honor.

20   That saves us a lot of time.

21            THE COURT:  224.

22      Q.   I thought we had it in the computer but I

23   think --

24            THE COURT:  How did you come out?

25      Q.   -- just have to refer to it in the binder.

1          THE COURT:  It is the last one.

2          THE WITNESS:  Yes, Your Honor.  I'm not

3    sure what I should do.

4      Q.    (By Mr. Chapman)  Wait.

5      A.    Okay.

6      Q.    Now, Mr. Fitzgerald, can you identify,

7    please, what Exhibit 224 is?

8      A.    Exhibit 224 is looking at the activity on

9    Linda Deaton's account from August 1994 through

10   September 1998.

11     Q.    And what was the source of the information

12   that you used to create this?

13     A.    I used the statements that were provided that

14   we had previously looked at.

15     Q.    That's Exhibit 209, all of the 84 months of

16   statements?

17     A.    As well as using a similar schedule that we

18   looked at earlier today that I think Ms. Deaton put

19   together.

20     Q.    And that's Exhibit 99 in evidence?

21     A.    Yes.  Yes.

22     Q.    Now can you please describe the method that

23   you used to create this calculation?

24     A.    The method that I'm using is just to presume

25   that there's no beginning balance on July 10th.

1    Q.   And why would you make that assumption?

2    A.   I think the supposition is that the entire

3    beginning balance on July 10th is associated with the

4    disputed charges.

5                THE COURT:  July 10th, 1994.

6                THE WITNESS:  Yes.  Thank you.  July

7    10th, 1994.

8    Q.   (By Mr. Chapman) So that would be taking the

9    $1,902 of principle charge on the account plus any

10   interest, late charges, and everything, and just

11   wiping them off?

12   A.   Yes, and saying that that was not a

13   legitimate part of the balance.  So what I wanted to

14   do is to calculate the impact of all of the subsequent

15   activity on the ending balance when we charged off the

16   account in September '98.

17   Q.   And based on your analysis then, just using

18   the undisputed portion of the charges, what would the

19   ending balance be as of September 1998?

20   A.   The ending balance, as of September '98, was

21   a charge off in the amount of $1,224.39.

22   Q.   And had that balance been delinquent for some

23   time prior to September 1998?

24   A.   The balance was delinquent each month from

25   April '98 through the month that we charged it off,

1   September '98.  And there were four previous months

2   that the account was delinquent, September '94,

3   January '95, September '95, and August -- I'm sorry,

4   October '97.

5       Q.   So based on this analysis --

6            THE COURT:  So what you actually charged

7   off was $7,000 something, huh?

8            THE WITNESS:  $7,856.

9       Q.   (By Mr. Chapman) So there are two scenarios

10  that you described?

11      A.   Yes.

12      Q.   One was the fact that you think the error was

13  corrected and the account balance grew to September

14  1998 and charged off, and then comparing -- what would

15  your conclusion be comparing it on the second

16  analysis, Exhibit 224?

17      A.   The analysis on the second Exhibit 224 is

18  that the cardholder was not paying off new purchases

19  in lieu of the disputed balance.

20      Q.   So on that billing error notification

21  information that's on the back of each credit card

22  statement, what is the cardholder informed about as

23  far as paying disputed and undisputed amounts?

24      A.   The customer never has to pay disputed --

25  never has to pay on the disputed portion of their

1    was delivered to the consumer.

2        Q.    And how long does the computer at First

3    U.S.A. maintain this information?

4        A.    It's my understanding that it is retained for

5    7 years.

6        Q.    So that would be 84 months of statements; is

7    that correct?

8        A.    That is correct.

9        Q.    And is that a moving system?

10       A.    Yes, it is.  My understanding with 20.5

11   million accounts, because that's an enormous amount of

12   data, we would have to transition data out in order to

13   capture new data in as we add accounts and so forth.

14       Q.    So at any one point in time, if you went

15   backwards for a customer's records, you would find

16   what?

17       A.    You would find 7 years worth of data.  Time

18   works against you.  As you try to review any

19   information beyond that time, it's going to be deleted

20   from the system.

21       Q.    Why is it that since First U.S.A. was served

22   with a compliant in August of 2001 you were able to

23   produce what's now identified as Exhibit 209?

24       A.    In learning from our legal department they

25   received the official notice in August of 2001, they

1    immediately contacted our statement retrieval area who

2    retained all of the statements and froze the data that

3    was available.

4         Q.   So that would be from August of 1994?

5         A.   That is correct.

6         Q.   Was there any information available to you

7    prior to August of 1994 in your system when you got

8    the complaint?

9         A.   Not that I've seen.

10        Q.   What was the status of Linda Deaton's account

11   when it was officially transferred over from Chevy

12   Chase Bank to First U.S.A.?

13        A.   The account was charged off by Chevy Chase in

14   September of 1998.  So when we took ownership of the

15   account in October of 1998, it had already been

16   charged off with approximately a $7,800 balance.

17        Q.   What is your understanding of the status or

18   definition of charged off account.  What does that

19   mean?

20        A.   A charged off account, by our definition, is

21   an account where the issuer of credit had not received

22   payment for at least a six month period of time.  We

23   then have to exercise other options.

24             As indicated before by my predecessor, we're

25   bound by regulations.  So at some point you have to