```
                IN THE UNITED STATES DISTRICT COURT

                     FOR THE DISTRICT OF HAWAII

                                  )
LINDA DEATON,                     )
                                  )
         Plaintiff,               )
                                  ) CIVIL NO. 01-352 SPK/BMK
                                  )
    vs.                           )
                                  )
CHEVY CHASE BANK,                 )     VOLUME V
a corporation, BANK ONE,          )   (Pages 1 - 70)
a corporation, and JANE           )
DOES 1-10 and JOHN DOES           )
1-10, DOE CORPORATION 1-10,)
and DOE GOVERNMENTAL              )
ENTITIES 1-10,                    )
                                  )
         Defendants.              )
                                  )
```

TRANSCRIPT OF PROCEEDINGS

     The above-entitled matter came on for FURTHER JURY TRIAL commencing at 10:00 a.m. on Friday, April 18, 2003, Honolulu, Hawaii,

BEFORE:   HONORABLE SAMUEL P. KING
          United States District Judge
          District of Hawaii

REPORTED BY:   LISA J. GROULX, COURT REPORTER
               Notary Public, State of Hawaii

1  acquire Linda Deaton's account?
2      A.   It was October of 1998.
3      Q.   And when did Ms. Deaton serve her complaint
4  in this case on Bank One?
5      A.   We received the notice through the mail
6  August of 2001.
7      Q.   Now have you checked your records at Bank One
8  to see if prior to August 2001 there was any inquiry
9  made by a CRA about Linda Deaton?
10     A.   Yes, and we could not find any record
11 indicating there was an inquiry.
12     Q.   And what did you check to make sure that was
13 true?
14     A.   We check all of our internal systems for any
15 sort of auto trail and also document retrieval system.
16     Q.   And what did you find?
17     A.   We had no evidence of any contact or inquiry.
18     Q.   There's been some allegation that in October
19 of 1999 there was a credit inquiry.  Are you familiar
20 with that allegation?
21     A.   Yes, I saw that during the trial.
22     Q.   How can you be sure that your system does not
23 show any inquiry coming in in October 1999?
24     A.   Our legal department was required to review
25 all systems associated with that and they had no

1  results in terms of any audit trail.
2           In addition to that, the correspondence that
3  I saw in the trial indicated that it was, I believe,
4  Credit Bureau of the Pacific.  And it is my
5  understanding that normally they would contact one of
6  the three main bureaus directly.
7       Q.   So, in other words, Credit Bureau of the
8  Pacific couldn't electronically send a message to Bank
9  One?
10      A.   Not to my knowledge.  That's not the way our
11 system is set up.
12      Q.   So if some credit reporting agency wanted to
13 contact Bank One to get information about Linda
14 Deaton, you're saying it would have to come from one
15 of the three names:  Experian, TransUnion or Equifax?
16      A.   That is correct, unless we have the exception
17 from Ms. Deaton.
18      Q.   So Credit Bureau of the Pacific, for example,
19 as you indicated, is like a sub agency not a national
20 agency.  They have to send a signal to one of those
21 three, then one of those three would come to you,
22 unless there were some special circumstances?
23      A.   That is my understanding.  It is difficult
24 for me to testify to exactly what their procedures
25 are, so.

1    Q.   Admitted into evidence in this case,
2  Ms. Herrera, were Exhibits 103 and 104, which,
3  according to the plaintiff and the records depositions
4  of TransUnion and Equifax -- have you reviewed those
5  exhibits?
6    A.   I believe so.
7    Q.   Did you find anything in those exhibits that
8  showed that there was any credit inquiry in October of
9  1999 between them and Bank One?
10    A.   No. And I reviewed that information again
11  last night.  So I didn't see anything from the October
12  time frame.
13    Q.   So, as far as the records of Bank One show no
14  contact or inquiry by CRA, and the records that we've
15  looked at for TransUnion and Equifax show no contact
16  in October '99.
17    A.   That not I interpreted on their reporting.
18    Q.   And those records would have been captured if
19  there had been an inquiry into your electronic system?
20    A.   Based on the deposition that I read, they
21  indicated that they had captured all of the
22  information.
23    Q.   Thank you.  Let's go back to the exhibit that
24  we were discussing yesterday, Exhibit 218, which is in
25  evidence, defendants' Exhibit 218.

```
 1                THE COURT:  Okay.
 2                MR. CHAPMAN:  When they acquired the
 3    account in October 1998.
 4                THE COURT:  For whatever good they are,
 5    they are admitted into evidence over objection.
 6                MR. CHAPMAN:  Thank you, Your Honor.
 7          (Defendants' Exhibit No. 219 received into
 8    evidence.)
 9                THE COURT:  I count 9 sheets.  Maybe
10    that's -- maybe I missed one.  Well, nobody can read
11    that.  So why don't you just go ahead.
12                MR. CHAPMAN:  Thank you, Your Honor.
13       Q.    (By Mr. Chapman) So it was in February 2002
14    that the two credit reporting agencies contacted Bank
15    One, right?
16       A.    That is correct.
17       Q.    Can you please describe what Bank One did
18    when the two credit reporting agencies, CRAs, made
19    these inquiries?
20       A.    We review the information in our system to
21    ensure that the data is accurate.  We then send a
22    response to the Bureau, typically within a 7 day time
23    frame, because the credit bureaus only have
24    approximately 30 days to complete the entire
25    investigation in order to be in accordance with the
```

```
 1   FCRA requirements.
 2          So they create the record when Ms. Deaton
 3   contacts them.  They then have to set up their
 4   transmission to us.  We need to extract the
 5   transmission.  We need to deliver it to the financial
 6   service advisor's desk top, allow them time to
 7   research, and then gather the data back and send it
 8   back to the Credit Bureau.
 9       Q.   And what time frame do you have to complete
10   that?
11       A.   Well, we have an internal standard of 7 days.
12   We have gone as long as 14 days, depending upon that
13   high volume period.
14       Q.   In this case, when that inquiry came in from
15   TransUnion and Equifax, what data did the Bank One
16   personnel review in order to be able to respond?
17       A.   Well, again, we review our internal systems
18   to ensure there aren't any open disputes on the
19   account and we validate the balance, in this case,
20   through the Recovery Management System.
21       Q.   And what was the response that was given to
22   the two credit reporting agencies?
23       A.   We did confirm that the balance was charged
24   off at the $7,854.
25       Q.   And that the account was correctly stated on
```

```
 1   they have, in total, to respond back to her about the
 2   inquiry?
 3       A.   I don't know about the response time period.
 4   I know it's my understanding that there is a 30 day
 5   time frame for investigation and resolution of the
 6   claim.
 7       Q.   So, in that 30 days, the consumer asked the
 8   CRA to check -- go back and double check the credit,
 9   then you have to check it, respond to the CRA, and the
10   CRA responds back to the consumer in 30 days?
11       A.   That is correct.
12       Q.   Now after that, after February 2002, were
13   there any other changes to Linda Deaton's account made
14   by Bank One?
15       A.   Yes.  In March of 2002, a paralegal in our
16   legal department did delete the trade line from all
17   three bureaus.
18           THE COURT:  Did what?
19           THE WITNESS:  Deleted the trade line
20   from all three credit reporting agencies.
21           THE COURT:  Deleted the information
22   which you had sent earlier?
23           THE WITNESS:  Yes.
24       Q.   (By Mr. Chapman) The court's question was you
25   deleted the information which you sent earlier.  Can
```

1  you please explain what you mean by deleted trade
2  line?
3      A.   Yes.  In our legal department, lacking all
4  details surrounding the lawsuit, we felt it prudent to
5  take the conservative approach and delete those trade
6  lines?
7      Q.   So if Ms. Deaton had investigated her credit
8  after March 2002, insofar as Bank One's information,
9  what would show up on the credit report?
10     A.   There would be no evidence that a trade line
11 ever existed.
12     Q.   So the inquiry came in February 2002, you
13 responded that the account was correctly stated.  And
14 March 2002 deleted it all together?
15     A.   That is correct.
16     Q.   So what would the current status be then
17 after March -- or what would the status be after March
18 2002 as far as Bank One's credit card information
19 showing up on Linda Deaton's credit?
20     A.   It should be non existent.  Internal to our
21 system, it would still be a loss for the bank but it
22 would be non existent to the credit reporting
23 agencies.
24     Q.   So it's fair to say that after March 2002 no
25 one would have any information about that First

```
 1  U.S.A./Chevy Chase Bank account any longer on the
 2  credit information of Linda Deaton?
 3       A.   That is my understanding.  The credit bureaus
 4  would need to clarify that.
 5            MR. CHAPMAN:  Thank you, Your Honor.  No
 6  other questions.
 7            THE COURT:  Cross-examine.
 8                      CROSS-EXAMINATION
 9  BY MR. PHILLIPS:
10       Q.   Ms. Herrera, would you take a look at the
11  defendants exhibits, and in there -- and I don't have
12  them number because mine are alphabetized, but there
13  is a copy of the Fair Credit Reporting Act.
14            Would you turn to that?  I would say it to be
15  about midway through.  Mine is letter N.  So maybe that
16  would be about 13 down.
17       A.   13 down?
18            THE COURT:  You don't have the exhibit
19  number?  Can you help us with an exhibit number?
20            THE WITNESS:  I found it.
21            THE CLERK:  Is it 213?
22            THE CLERK:  213.
23       Q.   (By Mr. Phillips) So Exhibit 213,
24  Ms. Herrera, do you have that?
25       A.   Yes, I do.
```

```
 1              THE COURT:  Let's put it this way.  Why
 2   don't you make an offer of proof.  What is she going
 3   to say?
 4              MR. PHILLIPS:  She is going to testify
 5   that she received a request for a residential mortgage
 6   credit check.
 7              THE COURT:  It is in evidence.
 8              MR. PHILLIPS:  The application for the
 9   loan is in evidence.
10              THE COURT:  Yeah.
11              MR. PHILLIPS:  And that when she
12   received it, and she received the information from
13   Linda Deaton on August of 1999 explaining that there
14   was a dispute, she forwarded that information to one
15   of the major three, which was Equifax in her
16   situation, that Equifax sent it to the bank, that the
17   bank did their --
18              THE COURT:  Which bank?
19              MR. PHILLIPS:  Chevy Chase or Bank One,
20   whichever one is relevant.
21              THE COURT:  Which bank?
22              MR. PHILLIPS:  Actually, at that time I
23   believe that report came back from Chevy Chase.
24              THE COURT:  Yeah.
25              MR. PHILLIPS:  And that it reported that
```

1    there was an investigation and no change.
2                THE COURT:  You have that in evidence.
3    Don't you have that in evidence?
4                MR. PHILLIPS:  We have the letter back
5    that said it was reinvestigated and there will be no
6    change.
7                THE COURT:  So, what is she going to
8    add?
9                MR. PHILLIPS:  Well, I think she would
10   make the jury feel a little more comfortable with the
11   evidence that's available for them to consider on the
12   question of the defendants' contention that a Credit
13   Bureau of the Pacific never could send a request for
14   an investigation to their bank because it was not one
15   of the big three and, therefore, we didn't get it
16   defense.
17               THE COURT:  Do you object?
18               MS. MARTIN:  Yes, Your Honor.  And for
19   the record, we would object to this witness being
20   brought at that time because this is improper
21   rebuttal.  This is part of plaintiff's case in chief.
22   Plaintiff had the burden, by the preponderance of the
23   evidence, to show that a Fair Credit Reporting Act
24   inquiry was triggered.  This has come up over and over
25   again.  It was plaintiff's burden to prove that it

```
 1  happened.  To come back and rebuttal --
 2              THE COURT:  Well, we have in evidence
 3  that they did send in a request.  We have in evidence
 4  that Nancy came back, and I just can't understand why
 5  you want somebody else to say the same thing.
 6              MR. PHILLIPS:  Well, Your Honor, I've
 7  stated my reasons on that.  And it was, just for the
 8  report, it was the First U.S.A. Bank in 1999, October
 9  of 1999.
10              THE COURT:  Who was?
11              MR. PHILLIPS:  That was the name of the
12  bank defendant who reported that the $7,854 was a bad
13  debt.
14              THE COURT:  Well, is that there in the
15  exhibits that you put in?
16              MR. PHILLIPS:  It is, Your Honor.  I
17  just wanted to -- you asked me which bank and I'm just
18  replying to you.
19              THE COURT:  So you got that in evidence
20  that they reported that they --
21              MR. PHILLIPS:  Your Honor, it is the
22  plaintiff's burden.
23              THE COURT:  I'm trying to get this case
24  over with.
25              MR. PHILLIPS:  I understand that, Judge.
```